# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| QHB HOLDINGS LLC, <u>et al.</u>,[1] | ) Case No. 09-14312 (    ) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 FOR (A) AN INTERIM ORDER (1) AUTHORIZING CONSENSUAL USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (2) MODIFYING THE AUTOMATIC STAY, (3) SCHEDULING A FINAL HEARING; AND (B) A FINAL ORDER (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POSTPETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING THE DEBTORS' CONSENSUAL USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, AND <u>(4) MODIFYING THE AUTOMATIC STAY</u>**

QHB Holdings LLC ("QHB Holdings") and its above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of (A) an interim order (substantially in the form attached hereto as Exhibit "A", the "Interim Order") (1) authorizing the interim use of Cash Collateral (as

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Generation Brands Holdings, Inc. (0247), Quality Home Brands Holdings LLC (0532), QHB Holdings LLC (0554), Generation Brands LLC (1825), Murray Feiss Import LLC (0556), Locust GP LLC (0565), LPC Management, L.L.C. (3596), Light Process Company, L.P. (2730), Sea Gull Lighting Products LLC (8003), Woodco LLC (1169), Tech L Enterprises, Inc. (7690), Tech Lighting L.L.C. (2152), LBL Lighting LLC (1784), and Tech L Holdings, Inc. (0613).

defined below) on an consensual basis and interim basis on the terms set forth in the Interim

Order; (2) granting "adequate protection" to the Pre-Petition Secured Parties (as defined below);

(3) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to the extent

necessary to implement and effectuate the terms of the Interim Order; and (4) scheduling a final

hearing with respect to the relief requested herein (the "Final Hearing"); and (B) a final order

substantially in the form attached hereto as Exhibit "B" (the "Final Order"),[2] inter alia:

(1) (a) authorizing the Debtors to enter into a $20,000,000 senior secured, superpriority debtor-

in-possession financing facility, including a $5,000,000 letter of credit facility (as amended,

modified or otherwise in effect from time to time, the "DIP Facility"), substantially on the terms

set forth in the debtor-in-possession credit agreement attached to the Final Order (as amended,

supplemented, or otherwise modified and in effect from time to time, the "DIP Credit

Agreement,"[3] together with all other agreements, documents, notes, certificates, and instruments

executed and/or delivered with, to or in favor of the DIP Secured Parties (as defined below), the

"DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP Superpriority Claims

(in each case, as defined below); (2) authorizing the use of Cash Collateral on a consensual and

final basis and authorizing the repayment of certain prepetition first lien loans with a portion of

the proceeds of the DIP Facility; (3) granting adequate protection to the Pre-Petition Secured

Parties and (4) modifying the automatic stay under section 362 of the Bankruptcy Code to

implement the terms of the DIP Facility.  In support of the Motion, the Debtors rely upon and

---

[2]    The Debtors request that the Court hold a final hearing on the DIP Facility by no later than December 30, 2009, so that, among other reasons, the Debtors will have sufficient liquidity to make the required year-end adequate protection interest payments.  If this is not feasible, then the Debtors will require interim approval of the DIP Facility or other emergency relief.

[3]    Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement or the Final Order.

refer this Court to the Affidavit of Daniel S. Macsherry in Support of First Day Motions and Applications (the "First Day Affidavit"), and respectfully represent as follows:

## Preliminary Statement

Prior to the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors' operations were funded, in part, with the proceeds of certain credit facilities described more fully below, among Quality Home Brands Holdings LLC, as borrower (the "Borrower"), QHB Holdings and all Debtor subsidiaries of the Borrower, as guarantors (the "Guarantors"), and the lenders thereunder. The obligations of the Debtors under such prepetition credit facilities are secured by liens on substantially all of the Debtors' respective properties and assets.

As set forth below and in the First Day Affidavit, the Debtors have already filed a proposed plan of reorganization and related disclosure statement, solicitation of which has already been completed. Assuming the Court approves such disclosure statement and confirms the Debtors' plan of reorganization on the schedule proposed by the Debtors, the Debtors are seeking to emerge from chapter 11 within approximately two months.

To achieve and confirm these highly-negotiated and carefully-constructed prepackaged Chapter 11 Cases, the Debtors require the use of cash which comprises the cash collateral of the lenders under the Debtors' first and second lien prepetition secured credit facilities (collectively, the "Pre-Petition Secured Parties") within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"),[4] and the proceeds of the proposed $20 million

---

[4]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

        [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products,

DIP Facility, mainly to fund day-to-day operations and maintain and preserve the Debtors' assets (including the Pre-Petition Collateral), in all cases for the benefit of the Debtors' estates and creditors, including the Pre-Petition Secured Parties. The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain their operations and is necessary for the preservation and maximization of their estates as a whole, pending their contemplated reorganization.

The Debtors seek during the interim period authority only to use Cash Collateral pursuant to the terms of the Interim Order. The Debtors seek to enter into the proposed $20 million DIP Facility only on a final basis after the Final Hearing.

As discussed and summarized more fully below, the Debtors propose to secure their obligations under the DIP Facility by, among other things, granting to the DIP Agent for the benefit of the DIP Secured Parties, senior, priming and/or junior liens on all of the Debtors' pre-petition and post-petition assets and property, with certain exceptions and, in each case, subject to a "carve out" described more fully below. The DIP Credit Agreement and the Final Order also provide the proposed lenders under the DIP Facility (the "DIP Lenders") with allowed superpriority administrative expense claims.

The Interim Order, the DIP Credit Agreement and the Final Order provide for, among other things, budgetary constraints on the use of Cash Collateral and the proceeds of the DIP Facility, and the payment of current, non-default rate interest of the First Lien Lenders. The Final Order provides for the permanent reduction and repayment of all outstanding prepetition

---

offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

11 U.S.C. § 363(a).

first lien revolving loans (i.e., approximately $8.2 million of the approximately $240 million of the Debtors' prepetition first lien obligations). Such amount plus up to approximately 12 months of additional incremental revolving credit will be available to fund the cases—the outstanding amount of the DIP Facility will be rolled into an exit facility at confirmation.

The Pre-Petition Secured Parties are also provided adequate protection, solely to the extent of any diminution in the value of their interests in the Pre-Petition Collateral as more fully set forth in the Interim Order and the Final Order (and subject to a "carve out"), in the form of replacement liens on substantially all of the Debtors' assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lenders).

If the Debtors are unable to obtain approval of the use of Cash Collateral on an interim basis and the use of Cash Collateral and approval of the DIP Facility on a final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized, reducing recoveries to all creditors. Entry of the Interim Order, and, after the requisite notice and the Final Hearing, the Final Order is therefore (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation and employees. Furthermore, access to the Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing. The Debtors, therefore, respectfully request that this Motion be granted.

## Bankruptcy Rule 4001 Statement

1.　　　In accordance with Bankruptcy Rule 4001, the following sets forth a concise summary of material terms of the proposed DIP Facility, the Interim Order and the Final Order:[5]

| | |
|---|---|
| Borrower: | Quality Home Brands Holdings LLC. |
| Guarantors: | QHB Holdings and each Subsidiary of the Borrower other than (a) any Excluded Foreign Subsidiary, (b) Locust East 140th Street L.P. and (c) MF Real Estate LLC. |
| DIP Agent: | BNP Paribas, as administrative agent and collateral agent. |
| DIP Lenders: | The banks and other financial institutions or entities from time to time parties to the DIP Credit Agreement. |
| DIP Facility: | Superpriority secured debtor-in-possession revolving credit facility in the aggregate principal amount of $20 million, including a $5 million subfacility for Letters of Credit. |
| Availability: | $20 million in the aggregate under the DIP Facility will be available upon entry of the Final Order. |
| Commitment Termination Date: | The earlier of (i) the date that is 90 days after the date on which the initial extensions of credit under the DIP Facility are made (the "Closing Date"), (ii) the date upon which the sale of substantially all of the Debtors' assets is consummated, or (iii) the date of the acceleration of the Loans and the termination of the Commitments as provided in the DIP Credit Agreement (the "Commitment Termination Date"). |
| DIP Facility Term: | The period commencing immediately after the entry of the Final Order until (i) a DIP Order Event of Default has occurred and is continuing, (ii) the occurrence of the Commitment Termination Date, or (iii) termination of the DIP Facility pursuant to the DIP Credit Agreement. |
| Use of Proceeds: | A portion of the DIP Facility proceeds will be used on the Closing Date to permanently reduce and repay the Pre-Petition Revolving Loans then outstanding. The remaining proceeds will be used to fund the Chapter 11 Cases, to pay fees and expenses associated with the DIP Facility, and for working capital and other corporate purposes of the Borrower. |
| Approved Budget: | The Debtors' use of Cash Collateral and DIP Facility proceeds will be in accordance with a budget attached to the Interim Order and DIP Credit |

---

[5]　　　This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order. Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof.

Agreement, respectively (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement and the appropriate consent of the DIP Lenders, the "Approved Budget"), reflecting detailed line-item operating cash receipts, operating disbursements, non-operating disbursements and professional fees of the Borrower and its Subsidiaries and the maximum amount of Loans outstanding, each on a weekly basis, for the 13-week period ending on February 26, 2010, satisfactory to the DIP Agent and the DIP Lenders.

Borrowing Base:   As at any date of determination, an aggregate amount equal to:

(i)   seventy percent (70%) of the Value of Eligible Accounts Receivable as reflected in the most recent Borrowing Base Certificate delivered under the DIP Credit Agreement, plus

(ii)   thirty-five percent (35%) of the Value of Eligible Inventory determined at the lower of cost or market on a first in first out basis consistent with Loan Parties' current and historical accounting practice as reflected in the most recent Borrowing Base Certificate delivered under the DIP Credit Agreement;

provided that the DIP Agent may, in its Permitted Discretion and upon at least five Business Days' prior notice to the Borrower, impose reserves against the Borrowing Base.

Interest Rate:   Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus 5.25%.

Each Base Rate Loan shall bear interest at a rate per annum equal to the Base Rate plus 4.25%.

Default Interest:   The otherwise applicable interest rate plus 2.00%.

Fees:   The Borrower will pay to the Administrative Agent for the account of each Revolving Lender a commitment fee for the period from and including the Filing Date to the last day of the Revolving Commitment Period, computed at the Commitment Fee Rate on the average daily amount of the Available Revolving Commitment of such Lender during the period for which payment is made, payable in arrears on the last day of each month and on the Revolving Termination Date, commencing on the first of such dates to occur after the date of the DIP Credit Agreement. The Borrower will also pay the Administrative Agent an agency fee while amounts under the DIP Credit Agreement remain outstanding.

The Borrower will pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to the Eurodollar Loans under the Revolving Facility, shared ratably among the Revolving Lenders and payable in arrears on each Letter of Credit Fee Payment Date after the issuance date. In addition, the Borrower will pay to the Issuing Lender for its own account a fronting fee on the undrawn

and unexpired amount of each Letter of Credit at a per annum rate equal to 0.25%, payable in arrears on each Letter of Credit Fee Payment Date after the Issuance Date.

In addition to the foregoing fees, the Borrower will pay or reimburse the Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

DIP Liens:

As security for the DIP Obligations (as defined below), effective and perfected upon the date of entry of the Final Order, the following security interests and liens are granted to the DIP Lenders (all such liens and security interests granted to the DIP Lenders, pursuant to the Final Order and the DIP Facility, the "DIP Liens"), subject, in all cases, only upon delivery of a Carve Out Trigger Notice (as defined below), to the payment of the Carve Out (as defined below), on all pre-petition and post-petition assets and property of the Debtors, whether existing on the Petition Date (as defined below) or thereafter acquired, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment and other fixed assets and proceeds and products of all of the foregoing (including insurance proceeds) (all such property being collectively referred to as the "DIP Collateral"); provided, however, that in no event shall the Obligations be secured by (or shall the DIP Collateral include) any pledge in excess of 65% of the total outstanding Capital Stock of any Excluded Foreign Subsidiary (if adverse tax consequences could result to the Debtors)), or any avoidance actions under Chapter 5 of the Bankruptcy Code (including, for the avoidance of doubt, under any similar state law by use of the strong arm powers of section 544 of the Bankruptcy Code) or the proceeds thereof:

    (a) **First Lien on Unencumbered Property**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date was not subject to valid, perfected, enforceable and non-avoidable liens.

    (b) **Liens Priming Pre-Petition Secured Parties' Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all DIP Collateral that is subject to the Pre-Petition Liens (as defined in the Final Order). Such security interests and Liens shall be senior in all respects to any current or future liens of the Pre-Petition Secured Parties on any DIP Collateral and any Liens that are junior thereto, including any Liens granted on or after the Petition Date to provide adequate protection in respect of the Pre-Petition Facilities.

(c) **Liens Junior to Certain Other Liens.** Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all DIP Collateral (other than the DIP Collateral described in clauses (a) or (b) above, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clauses), that was subject to valid and perfected liens in existence on the Petition Date that were permitted by the Pre-Petition First Lien Facility and are senior to the Pre-Petition Liens under applicable law, or to valid liens in existence on the Petition Date or perfected thereafter as permitted by section 546(b) of the Bankruptcy Code, if any (in each case, other than liens securing the Pre-Petition First Lien Facility and the Pre-Petition Second Lien Facility (as defined in the Final Order) (the "Existing Senior Liens"), which security interests and liens in favor of the DIP Lenders are junior to such valid, perfected and unavoidable liens.

(d) **Liens Senior to Certain Other Liens**. The DIP Liens and the Adequate Protection Replacement Liens (as defined below) shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 364 of the Bankruptcy Code or otherwise.

Carve-Out:      "Carve Out" means, on and after delivery of notice by the DIP Agent to the Borrower that an Event of Default (as defined in the DIP Credit Agreement) has occurred and the DIP Lenders desire to trigger the Carve Out (a "Carve Out Trigger Notice"), the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors on or after the date of delivery of the Carve Out Trigger Notice in an aggregate amount not in excess of $500,000 plus the amount of unpaid professional fees and expenses incurred by the Debtors and the payment of fees pursuant to 28 U.S.C. § 1930; provided that no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the Indebtedness of the Debtors owing to the DIP Lenders, the DIP Agent or indemnified parties under the DIP Credit Agreement or to the DIP Collateral.

So long as no Event of Default shall have occurred and be continuing, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve Out. The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and

shall not affect the right of the DIP Agent and the DIP Lenders to object to the allowance and payment of such amounts.

**Adequate Protection of Pre-Petition Secured Parties:**

As adequate protection for any Diminution in Value of the interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Secured Parties shall receive, as the case may be, adequate protection as follows:

**Adequate Protection Replacement Liens.** Solely to the extent of the Diminution in Value of the interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, the Pre-Petition Secured Parties shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, additional and replacement security interests and liens in the DIP Collateral (the "Adequate Protection Replacement Liens") which shall be junior only to the DIP Liens, the Existing Senior Liens, and the Carve Out as provided in the Interim Order and the Final Order. The Adequate Protection Replacement Liens of the Pre-Petition First Lien Secured Parties shall be senior and prior to the Adequate Protection Replacement Liens in respect of the Pre-Petition Secured Parties under the Pre-Petition Second Lien Facility.

**Adequate Protection Superpriority Claims.** Solely to the extent of the Diminution in Value of the interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, the Pre-Petition Secured Parties shall have allowed superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") which shall have priority, except with respect to (a) the DIP Liens, (b) the DIP Superpriority Claims, (c) Existing Senior Liens, and (d) the Carve Out, in all of the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The Adequate Protection Superpriority Claims granted to the Pre-Petition Secured Parties under the Pre-Petition First Lien Facility shall have priority over the Adequate Protection Superpriority Claims granted to the Pre-Petition Secured Parties under the Pre-Petition Second Lien Facility. Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate

Protection Superpriority Claims. The Adequate Protection Superpriority Claims granted to the Pre-Petition Secured Parties may be impaired pursuant to a Plan with the vote of sufficient holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code.

The Pre-Petition First Lien Secured Parties shall also receive adequate protection in the form of (i) interest payments under the Pre-Petition First Lien Facility at the non-default rate (including any LIBOR pricing option) and on the non-default interest payment dates specified in the Pre-Petition First Lien Facility (collectively, the "Adequate Protection Payments") and (ii) repayment of the Pre-Petition Revolving Loans.

**Financial Covenants:** So long as the Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any DIP Lender or DIP Agent under the DIP Credit Agreement, each of QHB Holdings and the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly

(a) As of the last Business Day of any calendar week during which Total Liquidity is equal to or less than $12,500,000, suffer or permit:

(i) cumulative Operating Cash Receipts (as defined in the Approved Budget) of the Borrower and its Subsidiaries, measured from the Closing Date to such date, to be less than 80% of the minimum cumulative Operating Cash Receipts budgeted for such period as set forth in the Approved Budget;

(ii) cumulative Operating Disbursements (as defined in the Approved Budget) of the Borrower and its Subsidiaries, measured from the Closing Date to such date, to exceed 115% of the maximum cumulative Operating Disbursements budgeted for such period as set forth in the Approved Budget;

(iii) cumulative Financial Disbursements (as defined in the Approved Budget) (other than interest, fees, or other amounts paid pursuant to this Agreement) of the Borrower and its Subsidiaries, measured from the Closing Date to such date, to exceed the maximum cumulative Financial Disbursements budgeted for such period as set forth in the Approved Budget.

(b) Suffer or permit the maximum cumulative Professional Fee Disbursements (as defined in the Approved Budget) of the Borrower and its Subsidiaries to exceed $6,000,000.

(c) At any time, suffer or permit Total Liquidity to be less than $8,000,000.

| | |
|---|---|
| <u>Affirmative and Negative Covenants</u>: | Customary for financings of this type, as set forth more fully in Sections 7 and 8 of the DIP Credit Agreement. The Interim Order requires the Debtors to comply with certain of these covenants, as modified, upon entry of the Interim Order and during the interim period. |
| <u>Use of Cash Collateral</u>: | Use of Cash Collateral is permitted pursuant to the Approved Budget and the terms and conditions set forth in the Interim Order and the Final Order. |
| <u>Events of Default</u>: | Customary and appropriate for financings of this type (subject to customary and appropriate grace periods), including, without limitation, failure to make payments when due, breaches of representations and warranties, defaults under other agreements or instruments of indebtedness, bankruptcy, certain violations of ERISA, judgments in excess of specified amounts, impairment of security interests in the DIP Collateral, invalidity of guaranties, noncompliance with covenants, and change of control. Financial covenant defaults will be subject to equity cure rights. |
| <u>Conditions to Initial Extensions of Credit</u>: | Include, <u>inter alia</u>: (i) execution and delivery of DIP Loan Documents, (ii) delivery of legal opinions, (iii) entry of the Final Order by the Bankruptcy Court, (iv) filing by the Debtors of a disclosure statement and plan of reorganization, and (v) the occurrence of the Closing Date no later than 30 days after the Petition Date. |
| <u>Conditions Precedent to Each Extension of Credit</u>: | Include, <u>inter alia</u>, accuracy of representations and warranties in all material respects, compliance with borrowing base requirements, and absence of any Event of Default or potential Event of Default. In addition, no extension of credit will be permitted if cash on hand would exceed $5,000,000 after giving effect to such borrowing (other than any Letter of Credit request). |
| <u>Indemnification</u>: | The Borrower agrees to indemnify each DIP Lender and to hold each DIP Lender harmless from any loss, cost or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of the DIP Credit Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of the DIP Credit Agreement, (c) the making of a prepayment of or conversion from Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto or (d) any other default by the Borrower in the repayment of Eurodollar Loans when and as required pursuant to the terms of the DIP Credit Agreement. |
| | The Borrower agrees to pay, indemnify, and hold each Lender and Agent and their respective officers, directors, employees, affiliates, trustees, advisors, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, |

enforcement, performance and administration of DIP Loan Documents, <u>provided</u>, that the Borrower shall have no obligation under the DIP Credit Agreement to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.

<u>Conversion to Exit Facility</u>:  Pursuant, and subject, to the terms and conditions set forth in Section 11.20 of the DIP Credit Agreement, the DIP Lenders agree, upon consummation of the Plan, to convert and continue all of the then outstanding amount of the Revolving Loans under the DIP Facility into the equivalent amount of revolving loans under an exit credit facility.

## **Disclosure Pursuant to Bankruptcy Rule 4001 and Compliance with Local Rule 4001-2**

2.     The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out in the following sections of the Interim Order, the Final Order and the DIP Credit Agreement:

- *Grant of a Priority or Lien on Property of the Estate*:  Interim Order ¶ 3(a); Final Order ¶¶ 4, 7(a); DIP Credit Agreement § 4.17(a).

- *Adequate Protection or Priority for a Claim that Arose Before Commencement of Chapter 11 Cases*:  Interim Order ¶ 3; Final Order ¶ 7; DIP Credit Agreement § 4.17(a).

- *Determination of Validity, Enforceability, Priority, or Amount of Claim that Arose Before Commencement of Case or of any Lien Securing the Claim*:  Interim Order ¶ E; Final Order ¶ E.

- *Waiver or Modification of Bankruptcy Code Provisions or Applicable Rules Relating to Automatic Stay*:  Interim Order ¶ 5, 9(b) and 14(i); Final Order ¶¶ 9, 17(a), 17(c) and 20(n).

- *Waiver or Modification of any Entity's Authority or Right to File Plan, Seek Extension of Exclusivity, Request Use of Cash Collateral or Request Authority to Obtain Credit*:  Final Order ¶ E(vi).

- *Establishment of Deadlines for Filing Plan, Approval of Disclosure Statement, Hearing on Confirmation or Entry of Confirmation Order*: DIP Credit Agreement §§ 6.1(m) and 9(l)(vi).

- *Waiver or Modification of Applicability of Nonbankruptcy Law Relating to Perfection of Lien on Property of Estate or on Foreclosure or Other Enforcement of Lien*:  Interim Order ¶ 5; Final Order ¶ 9.

- *Release, Waiver, or Limitation on any Claim or Other Cause of Action Belonging to Estate*:  Interim Order ¶ E(iv); Final Order ¶ E(iv).

- *Indemnification of any Entity*:  DIP Credit Agreement §§ 4.11, 10.7 and 11.5.

- *Release, Waiver, or Limitation of any Right under § 506(c)*:  Final Order ¶¶ G and 11; DIP Credit Agreement § 9(n)(ii).

- *Granting of a Lien on any Claim or Cause of Action Arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a)*:  Not Applicable

3.      Local Rule 4001-2 also requires that certain provisions of the DIP Facility be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions.  Set forth below are the provisions of the DIP Facility that are required to be identified in accordance with Local Rule 4001-2.  As discussed more fully below, the provisions of the DIP Facility as to which disclosure is required pursuant to Local Rule 4001-2 are all justified under the circumstances of these Chapter 11 Cases.  The Debtors were unable to obtain financing on more favorable terms from sources other than the DIP Lenders, and without such financing the Debtors' ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized.  The Debtors thus respectfully submit that the facts and circumstances of these Chapter 11 Cases demonstrate that the above-described provisions, which are set forth in greater detail below, are necessary and appropriate and should be authorized and approved by this Court.

4.      *Section 506(c) Waiver*.  Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c).  See Del. Bankr. L. R. 4001-2(a)(i)(C).  The Final Order (but not the Interim Order) provides that the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Cases) shall be deemed to have waived any rights or benefits of section 506(c) of the

Bankruptcy Code – the proposed waiver is only requested upon entry of the Final Order, and thus is not being imposed without notice.  See Final Order ¶¶ G and 11.

    5. *Use of Post-Petition Loans to Pay Pre-Petition Debt*.  Local Rule 4001-2(a)(i)(E) requires a description of provisions which contemplate the use of post-petition loans from a pre-petition secured creditor to pay part or all of that secured creditor's pre-petition debt.  See Del. Bankr. L. R. 4001-2(a)(i)(E).  The DIP Facility provides for the permanent reduction and repayment of any outstanding Pre-Petition Revolving Loans with a portion of the proceeds of the DIP Facility.   See Final Order ¶¶ H, 2(c) and 7(c); DIP Credit Agreement, at 13.

    6. As discussed below, such use of proceeds is appropriate and economically advantageous to the Debtors.  First, no alternative structure for the DIP Facility was acceptable to the Pre-Petition Secured Parties which did not include repayment of the Pre-Petition Revolving Loans.  The Pre-Petition Revolving Loans are secured by senior liens, which cannot be primed without the First Lien Lenders' consent or an expensive and highly uncertain priming fight with the First Lien Lenders.  Moreover, the total amount of Pre-Petition Revolving Loans outstanding is only $8.2 million (a small portion of the Debtors' outstanding prepetition first lien obligations, which total approximately $240 million).  Further, as set forth herein, the proposed DIP Facility is a $20 million borrowing base facility.  Thus, the revolving loans being repaid will be available to be re-borrowed under the DIP Facility, along with $12 million of additional incremental availability.  As discussed above, the proposed financing is critical to enabling the Debtors to consummate these prepackaged Chapter 11 Cases.  Importantly, it should be noted that under the prepackaged plan, the DIP Facility is proposed to be rolled into an exit facility.  So, the conversion of the Pre-Petition Revolving Loans to DIP Loans will not result in the cash payment of such amount if the prepackaged plan is confirmed.  Moreover, approval of the Final Order,

including the permanent reduction and repayment of the Pre-Petition Revolving Loans is a condition precedent to the initial extension of credit of the DIP Facility. See DIP Credit Agreement § 6.1(j).

7. Indeed, the proposed exit lenders' willingness to provide post-bankruptcy financing to the Debtors was also predicated on this structure. Without approval of such repayment of the Pre-Petition Revolving Loans, the Debtors' ability to access the proceeds of the DIP Facility and to exit from bankruptcy quickly as a sufficiently capitalized and funded enterprise will be jeopardized.

8. *Priming Liens*. Local Rule 4001-2(a)(i)(G), requires a description of any provisions of the proposed debtor-in-possession facility which contemplate a priming of any secured lien without the consent of that lienor. See Del. Bankr. L. R. 4001-2(a)(i)(G). As discussed more fully herein, the liens of the Pre-Petition Secured Parties are primed by the DIP Liens, and the Pre-Petition Secured Parties are provided the Adequate Protection Replacement Liens. In connection therewith, the Pre-Petition Secured Parties are receiving the Adequate Protection Superpriority Claims to the extent of any Diminution in Value of their interests in the Pre-Petition Collateral. Moreover, as indicated above, the Pre-Petition First Lien Secured Parties are receiving the Adequate Protection Payments. See Final Order ¶ 7; DIP Credit Agreement § 4.17(a). Finally, the First Lien Agent, on behalf of the Pre-Petition First Lien Secured Parties has expressly consented to such priming on the terms proposed in the DIP Credit Agreement.

9. *Other Local Rules Not Implicated by DIP Facility*. No separate disclosure or discussion is required with respect to subsections A, B, D and F of Local Rule 4001-2(a)(i), as there are no provisions in the DIP Facility that are implicated by the requirements therein. See Local Rule 4001-2(a)(i)(A) (Cross-Collateralization Protection); Local Rule 4001-2(a)(i)(B)

(Waiver of Claims Against Secured Creditor); Local Rule 4001-2(a)(i)(D) (Liens on Avoidance Actions); and Local Rule 4001-2(a)(i)(F) (Disparate Treatment for Creditors' Committee Professionals).

## Background

### A.     The Bankruptcy Cases

10.     On December 4, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code.  The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     No creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee.  No trustee or examiner has been requested or appointed in any of the Debtors' Chapter 11 Cases.

### B.     Overview of Business Operations

12.     As set forth in the organizational chart below, QHB Holdings is wholly owned by Generation Brands Holdings, Inc. ("New QHB").[6]

---

[6]     Prior to the Petition Date, New QHB was formed as a new Delaware corporation with no prior operations. Through a merger between New QHB, as the survivor, and QHB Investors Holdings, Inc., the then current majority owner of QHB Holdings, New QHB now owns 100% of the equity of QHB Holdings.  New QHB is a wholly owned subsidiary of a newly formed, Delaware limited liability company, Generation Brands Investors LLC, which, in turn, is owned by the former owners of QHB Holdings and the former owners of QHB Investors Holdings, Inc.



13.     QHB Holdings' wholly owned subsidiary, Quality Home Brands Holdings

LLC ("Quality Home Brands"), holds 61.84% percent of the equity interests in Generation

Brands LLC ("Generation Brands"), while Tech L Enterprises, Inc. ("Tech L"), a wholly owned

indirect subsidiary of Quality Home Brands, holds the remaining 38.16% of the equity interests in

Generation Brands.

14.     Generation Brands (together with its Debtor and non-Debtor affiliates, the

"Company") is a leading manufacturer, importer, marketer and supplier of decorative, functional,

and specialty indoor and outdoor lighting products, ceiling fans, low-voltage and line-voltage

track lighting systems and other home decor products.  The Company sells over 27,000 distinct residential and commercial lighting products, which it distributes through a diversified multi-channel national network of over 4,000 customers consisting of electrical wholesale distributors, lighting showrooms, selected furniture stores, mail order catalogs and a variety of specialty retailers.  The Company's products are also available at selected home centers and hardware stores such as Lowe's, Menards, HD Supply, The Great Indoors, Ace Hardware and TruServe.

15.     The Company is headquartered in Cary, North Carolina and operates primarily through three business units, each of which has multiple complementary brands that target specific end markets:  Murray Feiss Import ("MFI"), Sea Gull Lighting Products ("SGL") and Encompass Lighting Group ("Encompass").

16.     <u>Murray Feiss Import</u>.  MFI was founded in 1955 and is headquartered in The Bronx, NY.  It was acquired by Quad-C Partners VI, L.P. ("Quad-C") in 2004 and combined with SGL in 2005 to form Quality Home Brands.  MFI is comprised of two direct Debtor subsidiaries of Generation Brands, Murray Feiss Import LLC and Locust GP LLC, and two indirect non-Debtor subsidiaries of Generation Brands, MF Real Estate LLC and Locust East 140th Street L.P.  MFI is a leading designer, supplier and marketer of residential lighting products serving over 1,500 specialty lighting and furniture stores under the highly-regarded Murray Feiss brand and on a private label basis through Royce Lighting which targets mass-market "big-box" retailers.  The products sold under the Feiss and Royce brand names include transitional-styled chandeliers, outdoor lighting, lamps and vanity bath lights.  These products are targeted towards the remodeling and custom homebuilder end markets.

17.     <u>Sea Gull Lighting</u>.  SGL was founded in 1919 and is headquartered in Riverside, New Jersey.  Acquired by the Company in November 2005, it is comprised of four

Debtor subsidiaries of Generation Brands—Sea Gull Lighting Products LLC, Woodco LLC, LPC Management, L.L.C. and Light Process Company, L.P. SGL is a leading manufacturer, importer, marketer and supplier of decorative and specialty indoor and outdoor lighting and ceiling fan products serving the electrical wholesale, lighting showroom, homebuilder, and consumer markets. SGL's broad product offerings have enabled it to achieve approximately a 65% market share among the nation's top builders through directed-buy agreements with leading U.S. homebuilders, including Pulte Homes, KB Home, Lennar, Centex, Standard Pacific and others. Brands sold by the Sea Gull Lighting business unit include Sea Gull Lighting, Monte Carlo Fan Company, Ambiance Lighting Systems, Light Process Company, and Unique Lighting.

18. <u>Encompass Lighting</u>. Founded in 1983, Encompass' predecessor, Tech Lighting, began as a retail showroom in downtown Chicago. In 2005, Tech Lighting combined with LBL Lighting to become Encompass Lighting, a premier designer and manufacturer of architectural lighting systems, which was acquired by the Company in 2006. Encompass is headquartered in Skokie, Illinois and is comprised of two direct and indirect Debtor subsidiaries of Generation Brands—Tech Lighting L.L.C. and LBL Lighting LLC. Encompass is a premier designer and manufacturer of architectural lighting systems serving the residential and commercial end markets with a leading market position in the high growth low-voltage lighting systems category, with approximately 50% market share. Encompass is one of the fastest growing and most profitable companies in the industry, with a portfolio of brands including Tech Lighting, LBL Lighting, tiella, 2thousand degrees, T~trak, ELEMENT, and Wilmette Lighting. Encompass offers an extensive line of premium fixtures, low-voltage track lighting, decorative pendants, wall and bath fixtures, chandeliers, and outdoor lighting products.

20

C. **Capital and Debt Structure**

19. As of September 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $520 million. Of this amount, approximately $15 million was comprised of cash and cash equivalents, approximately $56 million was comprised of property and equipment, net of depreciation, and approximately $45 million was comprised of inventory. The Company's consolidated balance sheet also reflected total liabilities of approximately $488 million, the vast majority of which was attributable to the Pre-Petition First Lien Debt, the Pre-Petition Second Lien Debt and the Senior Notes (as defined below). As of the Petition Date, the Company estimates that it has approximately $13.4 million in aggregate Cash Collateral in various bank accounts held at JPMorgan Chase Bank, Wachovia Bank, N.A. and Standard Chartered Bank.

20. On June 20, 2006, the Company issued $35 million in Senior Notes due 2013 and entered into a First Lien Credit Agreement and Second Lien Credit Agreement, the proceeds of which were used to refinance existing debt and fund the acquisition of Encompass for $285 million.

21. Pre-Petition First Lien Debt. The First Lien Credit Agreement, dated as of June 20, 2006, by and among QHB Holdings, Quality Home Brands, as the Borrower, the First Lien Lenders, BNP Paribas as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Bear Stearns Corporate Lending Inc. ("Bear Stearns"),[7] as first lien administrative agent and first lien collateral agent, provided Quality Home Brands with a term loan commitment of $290 million (as amended from time to time, the "First Lien Term Loan") and a revolving loan commitment of $30 million (as amended from time to time, the "Pre-Petition Revolving Loans"

---

[7] Pursuant to that certain First Amendment, dated as of July 29, 2008, to the First Lien Credit Agreement, Bear Stearns was replaced by BNP Paribas as first lien administrative agent and first lien collateral agent.

and, together with the First Lien Term Loan, the "Pre-Petition First Lien Debt"). The First Lien

Term Loan matures on December 20, 2012 and the Pre-Petition Revolving Loans mature on June

20, 2012. The Pre-Petition First Lien Debt is guaranteed by the Guarantors, and is secured by

liens on substantially all of the Debtors' assets. As of the Petition Date, the approximate amounts

outstanding under the First Lien Term Loan and the Pre-Petition Revolving Loans were $231.1

million and $8.2 million, respectively.

22.    Pre-Petition Second Lien Debt. The Second Lien Credit Agreement, dated

as of June 20, 2006, by and among QHB Holdings, Quality Home Brands, as borrower, the

Second Lien Lenders, BNP Paribas as syndication agent, and Bear Stearns[8] as second lien

administrative agent and second lien collateral agent, provided Quality Home Brands with a term

loan commitment of $100 million (as amended from time to time, the "Second Lien Term Loan").

The Second Lien Term Loan matures on June 20, 2013. The Second Lien Term Loan is

guaranteed by the Guarantors and is secured by second liens on substantially all of the Debtors'

assets. As of the Petition Date, the approximate amount outstanding under the Second Lien Term

Loan was $101.2 million.

23.    Senior Notes. Pursuant to that certain Note Purchase Agreement by and

between QHB Holdings and Apollo Investment Corporation ("Apollo"), dated as of June 20,

2006, Apollo purchased notes issued by QHB Holdings in the aggregate principal amount of $35

million (the "Senior Notes"). Pursuant to the Second Amendment to the Note Purchase

Agreement, dated July 2008, the Senior Notes currently accrue interest at 14.5% per annum and

are scheduled to mature in December 2013. The Senior Notes are not guaranteed and are

---

[8]       Pursuant to that certain First Amendment, dated as of July 2008, to the Second Lien Credit Agreement, The
Bank of New York Mellon replaced Bear Stearns as second lien administrative agent and second lien collateral
agent.

unsecured. As of the Petition Date, the approximate amount outstanding under the Senior Notes was $54.7 million.

      **D.**       <u>**Events Leading to the Commencement of the Chapter 11 Cases**</u>

      24.       The severe downturn in residential remodeling, which accounts for approximately 80% of the Company's sales, has placed significant pressure on the Company's balance sheet and ability to remain in compliance with its financial covenants. Specifically, in May 2008, certain of the Company's ultimate equity holders, including its majority equity holder, Quad-C, were required to pay approximately $5 million in order to cure certain financial defaults under the First Lien Credit Agreement. Shortly following this payment, in July 2008, the Company sought and obtained amendments to the First Lien Credit Agreement and the Second Lien Credit Agreement, which relaxed certain financial covenants and amended the pricing of those facilities. In exchange for these amendments, the Company lost $10 million in availability under the Pre-Petition Revolving Loans and was required to prepay approximately $20 million of the Pre-Petition First Lien Facility which, like the $5 million equity cure, was funded by cash infusions from the Company's equity holders, including Quad-C. Further, the Company agreed to reduce the principal amount outstanding under the Pre-Petition First Lien Facility by an additional $15 million, which amounts were paid as required by June 26, 2009 from the proceeds of the sale of an option on certain real estate assets to an affiliate of Quad-C.

      25.       Following the amendments to the credit agreements, the deterioration in the Company's business accelerated. By the first quarter of 2009, the Company sought and obtained additional covenant relief from the Pre-Petition Secured Parties to avoid defaulting under the credit agreements. However, the business continued to be negatively affected by the challenging economic environment and, by May 2009, the Company recognized that if the operating environment continued to deteriorate, the Company could potentially face a covenant

default later in the year. Furthermore, the Company came to the conclusion that its capital structure was unsustainable and did not provide the financial flexibility necessary to operate in the current business environment.

26.     Accordingly, in June 2009, the Company engaged Barclays Capital as its financial advisor to explore strategic alternatives to address the Company's over-leveraged capital structure. Shortly thereafter, the Company also commenced discussions with certain of the Pre-Petition Secured Parties and Apollo regarding the terms of a consensual restructuring transaction that could result in significant deleveraging and improved financial flexibility for the Company going forward.

27.     By September 2009, the Company determined that it was unlikely that it would remain in compliance with the financial covenants under the First Lien Credit Agreement. As such, the Company sought and, on September 28, 2009, received a waiver of a payment default and a temporary waiver of certain potential covenant defaults under the First Lien Credit Agreement through November 25, 2009 to allow time for the Company, the Pre-Petition Secured Parties and Apollo to continue discussions regarding the final terms and ultimate solicitation of a proposed restructuring. In connection with the aforementioned waiver, the Company agreed to an elimination of its ability to make any additional borrowings under the Pre-Petition Revolving Loans.

28.     Following extensive discussions with a large number of the Pre-Petition Secured Parties and Apollo—which, among other things, involved negotiating and finalizing term sheets reflecting the material terms of a proposed restructuring—on November 10, 2009, the Company solicited acceptances of the final form of restructuring proposal (the "Restructuring"), which was set forth in that certain Proposal to Restructure, Disclosure Statement and Solicitation

of Acceptances of a Prepackaged Plan of Reorganization (the "Disclosure Statement"), filed concurrently herewith.  As set forth in the Disclosure Statement, the Company sought approval of the Restructuring—which only modifies the Company's existing capital structure and, as such, does not alter the rights of creditors other than the Pre-Petition Secured Parties and Apollo— through a consensual transaction outside of bankruptcy with the unanimous support of the Pre-Petition Secured Parties and Apollo (the "Out-of-Court Transaction"), or, if such unanimous consent was not obtained, in accordance with the terms of the prepackaged plan of reorganization (the "Plan") attached to the Disclosure Statement, subject to bankruptcy court approval.

29.     As more fully described in the Disclosure Statement, the Plan generally provides for the satisfaction of (i) the Pre-Petition First Lien Debt through the use of certain Cash-Pay Term Loans and PIK Term Loans (each as defined in the Plan); (ii) the Pre-Petition Second Lien Debt through the issuance of New Common Stock (as defined in the Plan) of New QHB sufficient to result in an aggregate common equity ownership of New QHB at closing of 91.75% (excluding, for this purpose, shares issuable upon conversion of the New Preferred Stock and shares to be issued under a new Management Incentive Plan (each as defined in the Plan)) and (iii) the Senior Notes through the issuance of New Common Stock of New QHB sufficient to result in an aggregate common equity ownership of New QHB at closing of 7.50% (excluding, for this purpose, shares issuable upon conversion of the New Preferred Stock and shares to be issued under a new Management Incentive Plan).  Additionally, the Plan provides for Quad-C or its designee to invest $20 million in the Debtors through the purchase of New Preferred Stock on the terms and subject to the conditions of the Preferred Stock Purchase Agreement.  Notably, with the exception of the Pre-Petition Secured Parties and Apollo, all of the Company's creditors and equity holders are unimpaired under the Plan.

30.     The deadline to vote to accept or reject the proposed Restructuring (whether effectuated through an Out-of-Court Transaction or through the Plan) expired on November 25, 2009 at 12:00 noon (Prevailing Eastern Time).  Although Apollo and a majority of the Pre-Petition Secured Parties voted in favor of the Restructuring—specifically, the Plan was accepted by approximately 75% in number and more than 80% in amount of holders of the Pre-Petition First Lien Debt, as well as by more than 81% in number and more than 97% in amount of holders of the Pre-Petition Second Lien Debt that cast ballots on the Plan[9]—a small number of the Pre-Petition Secured Parties voted to reject the Restructuring, thus preventing the Debtors from consummating it through the Out-of-Court Transaction.  To prevent the consequences of defaults under the First Lien Credit Agreement, preserve the Debtors' business as a going-concern, and restructure their debt in accordance with the Plan, the Debtors commenced these cases under chapter 11 of the Bankruptcy Code.

## Jurisdiction

31.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

32.     By this Motion, the Debtors seek entry of the Interim Order, *inter alia*:

(i)     under sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authorizing the interim use of Cash Collateral by the Debtors, in accordance with the Approved Budget and under the terms set forth in the Interim Order;

(ii)    under sections 361 and 363(e) of the Bankruptcy Code, authorizing

---

[9]     The tabulation of votes on the Debtors' Plan is set forth in the Affidavit of Service and Declaration of James Katchadurian of Epiq Bankruptcy Solutions, LLC Regarding the Mailing, Voting and Tabulation of Ballots Accepting and Rejecting Joint Prepackaged Chapter 11 Plan of Reorganization for QHB Holdings LLC and its Affiliated Debtors, which has been filed concurrently herewith.

the granting to the Pre-Petition Agents, for the benefit of the Pre-Petition Secured Parties, of the Adequate Protection Replacement Liens and Adequate Protection Superpriority Claims to the extent of any Diminution in Value of the Pre-Petition Agent's interests in the Pre-Petition Collateral, and having the priorities set forth in the Interim Order, as well as additional adequate protection in the form of payment of current interest to the First Lien Lenders at the applicable non-default rate (including any LIBOR pricing option) and on the non-default interest payment dates set forth in the Pre-Petition First Lien Credit Agreement;

(iii)    under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and

(iv)    scheduling the Final Hearing for no later than December 30, 2009 to consider entry of the Final Order granting the relief requested in the Motion on a final basis, including final approval of the Debtors' use of Cash Collateral and entry into the DIP Credit Agreement, and approving the form of notice with respect to the Final Hearing; and

(v)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the Interim Order.

33.    Additionally, by this Motion, the Debtors seek entry, after notice and the Final Hearing, of the Final Order, inter alia:

(i)    under sections 363, 364(c) and 364(d) of the Bankruptcy Code, authorizing the Debtors to obtain senior secured superpriority priming debtor-in-possession financing on a final basis under the terms and conditions of the DIP Credit Agreement and the other DIP Financing Agreements, consisting of a revolving loan facility in an aggregate principal amount of $20 million, with a $5 million subfacility for Letters of Credit, from BNP Paribas, as administrative agent (in such capacity, the "DIP Administrative Agent") for itself and the DIP Lenders, and as collateral agent (in such capacity, the "DIP Collateral Agent", together with the DIP Administrative Agent, the "DIP Agent", and collectively with the fronting and issuing banks for the Letters of Credit, the DIP Lenders and each other secured party under the DIP Loan Documents from time to time, the "DIP Secured Parties"), and authorizing the Debtors to enter into and comply in all respects with the DIP Financing Agreements, and approving the terms and conditions of the DIP Financing Agreements;

(ii)     under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtors to use the proceeds of the DIP Facility in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Approved Budget, upon entry of the Final Order, to (i) permanently reduce and repay the Pre-Petition Revolving Loans then outstanding under the Pre-Petition First Lien Facility, (ii) to fund the Chapter 11 Cases, (iii) to pay fees and expenses associated with the DIP Facility, and (iv) for working capital and other corporate purposes of the Debtors;

(iii)    under sections 364(c)(2), 364 c)(3) and 364(d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Financing Agreements, authorizing the Debtors to grant to the DIP Agent (for the benefit of the DIP Secured Parties) first priority priming, valid, perfected and enforceable liens, subject only to the Carve Out and any Existing Senior Liens, upon substantially all of the Debtors' real and personal property, as described below and in the Final Order, the DIP Credit Agreement and the other DIP Financing Agreements;

(iv)    under section 364(c)(1) of the Bankruptcy Code, granting in favor of the DIP Agent (for the benefit of the DIP Secured Parties) a superpriority administrative expense claim (the "DIP Superpriority Claim") in respect of all Obligations under (and as defined in) the DIP Credit Agreement (the "DIP Obligations"), subject only to the payment of the Carve Out;

(v)     under sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authorizing the use of Cash Collateral by the Debtors on a final basis, in accordance with the terms set forth in the Final Order;

(vi)    under sections 361, 363 and 364(d)(1) of the Bankruptcy Code, authorizing the granting to the Pre-Petition Agents (for the benefit of the Pre-Petition Secured Parties) of the Adequate Protection Replacement Liens and the Adequate Protection Superprioity Claims to the extent of any Diminution in Value and having the priorities set forth in the Final Order, as well as additional adequate protection in the form of (i) the permanent reduction and repayment of any outstanding Pre-Petition Revolving Loans with a portion of the proceeds of the DIP Facility and (ii) payment of current interest to the First Lien Lenders at the applicable non-default rate (including any LIBOR pricing option) and on the non-default interest payment dates set forth in the Pre-Petition First Lien Credit Agreement;

(vii)   under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the Final Order, the DIP Credit Agreement and the other DIP Financing Agreements;

(viii)  waiving any right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(ix)    waiving any applicable stay (including under Bankruptcy Rule 6004) and proving for the immediate effectiveness of the Final Order.

**Basis for Relief**

A.   **The Debtors' Need for Financing and Use of Cash Collateral**

34.    As indicated above, the financing requested herein is being requested for only a short period of time, as the Debtors contemplate exiting chapter 11 within approximately two months.  Despite the proposed expedited term of the Chapter 11 Cases, however, such financing is critical to the Debtors' operations and their ability to preserve the Pre-Petition Collateral.  As indicated above, the proposed financing under the DIP Facility (the "DIP Financing") was negotiated as part of the Debtors' prepackaged bankruptcy.  If the Debtors are unable to obtain approval of the proposed DIP Facility (including the permanent reduction and repayment of the Pre-Petition Revolving Loans on a final basis) and use of Cash Collateral on an interim and final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized.

35.    Among other things, the Debtors need to assure their existing and future customers of their ability to operate in chapter 11 in the ordinary course.  Moreover, the liquidity to be provided pursuant to the DIP Facility is necessary for the Debtors' continued existence as a going concern, particularly at this critical juncture when the Debtors must continue to service and maintain the confidence of their patrons and suppliers and assure them that the Debtors' businesses will remain viable despite these Chapter 11 Cases.  Without access to the proceeds of

the DIP Facility and authorization to use Cash Collateral, the Debtors' vendors and suppliers may hesitate to continue to do business with them on customary terms.

36.     Accordingly, the Debtors have an immediate need to use Cash Collateral and will also need to access the DIP Facility in the next few weeks in order to continue their operations without impairment and complete the restructuring process on the proposed expedited basis.  Moreover, authorization to use Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors, pending the Final Hearing.

**B.     The Debtors' Entry into the DIP Facility is Authorized Under Section 364 of the Bankruptcy Code**

37.     Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize post-petition financing for a chapter 11 debtor in possession.  See In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 145 B.R. 312 (B.A.P. 9th Cir. 1992).

38.     Bankruptcy courts have the power to authorize secured post-petition financing under section 364 of the Bankruptcy Code, which provides, in pertinent part, as follows:

> (c)     If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3)     secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior

or equal lien on property of the estate that is subject to a lien only
if –

       (A)     the [debtor in possession] is unable to obtain
such credit otherwise; and

       (B)     there is adequate protection of the interest of
the holder of the lien on the property of the estate on which
such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

39.     "Having recognized the natural reluctance of lenders to extend credit to a

company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to

extend post-petition credit.'" Defender Drug Stores, 126 B.R. at 81 (quoting Unsecured

Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil

Co.), 834 F.2d 599, 603 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988)).  The incentives

enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court

may grant.  Id.  In fact, it is not uncommon for a court to approve a lending arrangement

containing terms that far exceed those authorized by section 364.  Id.

40.     Generally, courts apply a three-part test to determine whether a debtor in

possession may obtain credit under section 364(c) of the Bankruptcy Code.  Under such test, the

Debtors may incur post-petition financing under the DIP Facility pursuant to section 364(c) if

they demonstrate that (a) they cannot obtain credit unencumbered or without superpriority status,

(b) the DIP Facility is necessary to preserve the assets of their estates, and (c) the terms of the

DIP Facility are fair, reasonable and adequate given the circumstances of the Debtor-borrowers

and the proposed lenders.  See In re Crouse Group, Inc., 71 B.R. 544, 549-50 (Bankr. E.D. Pa.

1987); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

41.     In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor

in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is

unable to obtain financing from another source and (b) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected. 11 U.S.C. § 364(d)(1); see also Aqua Assocs., 123 B.R. at 196. Consent by the secured creditors to priming obviates the need to show adequate protection. See Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the Pre-Petition Secured Parties have consented or (ii) the Pre-Petition Secured Parties' interests in collateral are adequately protected.

42.     Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). Debtors in possession are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under section 364 of the Bankruptcy Code. Id. at 38.

(i)     The Debtors Are Unable to Obtain Unsecured or Junior Secured Credit

43.     To show that the credit required is not obtainable on an unsecured basis, the Debtors need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) or (d) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Anchor Sav. Bank, 99 B.R. at 120 n.4 (noting that the debtor satisfied the requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); Ames, 115 B.R. at 37-40 (debtor in possession must show that

it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088; see also In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing" where the debtor "suffers some financial stress and has little or no unencumbered property"), aff'd sub nom., Anchor Sav. Bank, 99 B.R. at 117.

44.     As discussed above and in the First Day Affidavit, the Debtors' assets are subject to the Pre-Petition Liens asserted by the Pre-Petition Secured Parties. Because of the Debtors' substantial amount of pre-petition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Pre-Petition Secured Parties, was not a viable option, especially from a third party who did not already have a financial interest in the Debtors to protect. Moreover, the Pre-Petition Secured Parties would not have consented to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender. In fact, the DIP Financing here is part of the Debtors' prepackaged bankruptcy, the terms of which were heavily negotiated by, among others, the Pre-Petition Secured Parties. The Debtors thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable. Indeed, the Debtors believe that interest rates under the DIP Facility are likely below market and, thus, an integral component of the Debtors' restructuring efforts.

(ii)     The Pre-Petition Secured Parties' Interests in the Pre-Petition Collateral are Adequately Protected

45.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on

property of the estate that is already subject to a lien (i.e., a priming lien).  See 11 U.S.C. §

364(d).  Such relief may be granted so long as there is adequate protection of the secured

creditor's interests in the property on which the senior lien is supposed to be granted.  See id.; see

also Aqua, 123 B.R. at 196.  Although the Bankruptcy Code does not explicitly define "adequate

protection," section 361 of the Bankruptcy Code provides that it may take the form of (1) a cash

payment or periodic cash payments to the extent that there is a decrease in the lien holder's

property interest; (2) an additional or replacement lien to the extent that there is a decrease in the

lien holder's property interest; or (3) other relief that will result in a secured party's realizing the

indubitable equivalent of its property interest.  See 11 U.S.C. § 361.

46.     Where a debtor's proposed use of funds from additional post-petition

financing augment the value of the secured creditor's collateral, adequate protection exists.  Sky

Valley, 100 B.R. at 114 (noting the flexible nature of section 361(3) and collecting cases).  The

Debtors believe that the measures of protection set forth in the DIP Facility constitute adequate

protection.  In addition to replacement liens on substantially all assets, junior in priority only to

the DIP Liens and any Existing Senior Liens (and subject to the Carve Out), the Pre-Petition

Agents and Pre-Petition Secured Parties will receive superpriority administrative expense claims,

and the First Lien Lenders will receive payment of current interest and the repayment of a portion

of the Pre-Petition First Lien Facility.  Moreover, the use of any DIP Facility proceeds shall be

solely in accordance with the Approved Budget and subject to borrowing base requirements.

Accordingly, the DIP Facility not only maintains the value of the collateral in which the Pre-

Petition Secured Parties are receiving replacement liens, it increases the collateral base and

strengthens the value of the Debtors' businesses.

47.     Finally, as mentioned above, consent may take the place of adequate protection under section 364(d)(1) of the Bankruptcy Code, and the Debtors have obtained the consent of the First Lien Agent on behalf of the Pre-Petition First Lien Secured Parties to use the Cash Collateral on the terms set forth in the Final Order.

    (iii)     <u>Repayment of the Pre-Petition Revolving Loans Should Be Authorized</u>

48.     Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations.  <u>See, e.g.</u>, <u>Institutional Creditors of Continental Air Lines, Inc.  v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)</u>, 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property).  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree in the interest of preserving or protecting the value of the Debtors' assets.  <u>See</u> <u>Chinichian v. Campolongo (In re Chinichian)</u>, 784 F.2d 1440, 1443 (9th Cir. 1986) (noting that Section 105 permits "the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code").

49.     As noted above, the repayment of the Pre-Petition Revolving Loans is supported by sound business judgment.  First, no alternative structure for the DIP Facility was available that did not include repayment of the Pre-Petition Revolving Loans.  Second, the Pre-Petition Revolving Loans are secured by senior liens, which cannot be primed without the First Lien Lenders' consent or an expensive and highly uncertain priming fight with the First Lien Lenders.  Third, the total amount of Pre-Petition Revolving Loans outstanding is only $8.2 million (a small portion of the Debtors' outstanding prepetition first lien obligations, which total approximately $240 million).  Fourth, as set forth herein, the proposed DIP Facility is a $20 million borrowing base facility.  Thus, the revolving loans being repaid will be available to be re-

borrowed under the DIP Facility, <u>along with $12 million of additional incremental availability</u>. As discussed the proposed financing is critical to enabling the Debtors to consummate this prepackaged chapter 11 case. Importantly, it should be noted that under the prepackaged plan, the DIP Facility is proposed to be rolled into an exit facility. So, the conversion of the Pre-Petition Revolving Loans to DIP Loans will <u>not</u> result in the cash payment of such amount if the prepackaged plan is confirmed. Moreover, approval of the Final Order, including the permanent reduction and repayment of the Pre-Petition Revolving Loans is a condition precedent to the initial extension of credit of the DIP Facility. <u>See</u> DIP Credit Agreement § 6.1(j). Without approval of such repayment of the Pre-Petition Revolving Loans, the Debtors' ability to access the proceeds of the DIP Facility is jeopardized as is their ability to obtain the proposed exit facility and consummate the proposed prepackaged Plan that was accepted by an overwhelming majority of the First Lien Lenders. For the foregoing reasons, the Debtors respectfully submit that under the foregoing circumstances, the repayment of the Pre-Petition Revolving Loans should be approved. <u>See, e.g.</u>, <u>In re LandSource Communities Development LLC</u>, Case No. 08-11111 (KJC), Dkt. No. 306 at ¶ 20 (Bankr. D. Del. Jul. 19, 2008) (allowing "roll-up" and "deemed refinancing" of pre-petition first lien obligations with a portion of post-petition term loan).

   (iv) <u>The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estates</u>

    50.  The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations during the expedited term of the Chapter 11 Cases and will signal the Debtors' continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued support of the Debtors' customers and critical suppliers. Furthermore, based upon the Debtors' evaluation of comparable debtor-in-possession loans, the interest rates and fees appear to be

consistent with or better than the existing market for debtor-in-possession loans of this nature. The Debtors believe that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

51.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facility.

52.     Moreover, as stated above, the terms of the DIP Facility and the Final Order were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.  Accordingly, the DIP Lenders should be provided with the benefit and protection of

section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

**C.     The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized**

53.     The Court should authorize the Debtors to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash. A copy of a proposed budget for the use of Cash Collateral is attached to the Interim Order. It is essential to the continued operation of the Debtors that they obtain authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of the Chapter 11 Cases. Currently, the Debtors have little or no available cash or assets readily convertible into cash that are not likely subject to the Pre-Petition Secured Parties' asserted liens and security interests.

54.     If the Debtors are permitted to use Cash Collateral to fund ongoing business operations and administration of these chapter 11 cases, the Debtors will preserve the value of the Debtors' assets as a going concern. Thus, the Debtors can continue to run their business successfully, but only if they are allowed to use Cash Collateral in the course of their day-to-day operations. Without such use, the detrimental result to the estate will be rapid and ultimately disastrous, given the nature of the Debtors' business. Access to Cash Collateral is crucial to the Debtors' ability to avoid immediate and irreparable harm to their estates, creditors, and ongoing businesses both before and after the Final Hearing.

55.     Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral. Specifically, section 363(c)(2) provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
> (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Additionally, section 105(a) of the Bankruptcy Code, provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

56.     The Debtors respectfully submit that the proposed use of Cash Collateral, in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve their assets and property (including the Pre-Petition Collateral).  The Debtors' proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Pre-Petition Secured Parties, and enhances the prospects of a successful outcome of the Chapter 11 Cases.

D.     **The Proposed Adequate Protection for the Use of Cash Collateral Is Appropriate**

57.     In considering whether to authorize use of cash collateral, a court generally must find that the interests of the holder of the secured claim are adequately protected.  See 11 U.S.C. § 363(e).  Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The Debtors' use of Cash Collateral is conditioned upon adequate protection being provided to the Pre-Petition Secured Parties, as set forth in the Interim Order and the Final Order.

58.     The Pre-Petition Secured Parties' primary form of adequate protection will be the Debtors' use of Cash Collateral to preserve the going concern value of the Debtors' assets

and solely in accordance with the Approved Budget.  Courts have held that adequate protection may be demonstrated by a showing that the going concern value of the debtor is preserved by the debtor's continuing operations and use of cash collateral.  See, e.g., In re Snowshoe Co., Inc., 789 F.2d at 1087-89 (trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations).  Additionally, as mentioned above, the Debtors will be granting replacement liens and superpriority claims as adequate protection, something that is commonplace.  See, e.g., MBank Dallas N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.), 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor); Wrecclesham Grange, 221 B.R. at 981) (noting that a replacement lien of equal value on postpetition rents is adequate protection); In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings).  Furthermore, among other forms of adequate protection, the Debtors also propose to make certain interest payments.  The periodic cash payment of current interest is clearly a generally accepted form of adequate protection.  See 11 U.S.C. § 361(1); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (observing that cash payments constitute a form of adequate protection under section 361 of the Bankruptcy Code); In re Crockett, 3 B.R. 365, 368 (Bankr. N.D. Ill. 1980) (payment of interest accepted as a form of adequate protection).

59.     For the foregoing reasons, the Debtors respectfully submit that the adequate protection contemplated herein (described in more detail above) and in the Interim Order and Final Order is appropriate and should be approved.

### Request for a Final Hearing

60.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than December 30, 2009 and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

### The Need for Immediate Relief Pending a Final Hearing

61.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fifteen (15) days after service of such motion.  Fed. R. Bankr. P. 4001(b)(2).  Upon request, however, a court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the debtors' estates pending a final hearing, based on the business exigencies of individual cases.  See id.  The Debtors submit that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is necessary to enable the Debtors to maintain ongoing operations and avert the immediate and irreparable harm to their business.

### Waiver of Bankruptcy Rules 6004(a) and (h)

62.     Should the Court grant the Motion and enter the Interim Order and Final Order, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

63.     Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the Pre-Petition Agents, counsel to Apollo, the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), and all parties requesting notices pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit that no other or further notice need be provided.

64.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  December 5, 2009
        Wilmington, Delaware

FOX ROTHSCHILD LLP

By: /s/ Eric M. Sutty
    Jeffrey M. Schlerf (No. 3047)
    Eric M. Sutty (No. 4007)
    Citizens Bank Center, Suite 1600
    919 North Market Street
    Wilmington, DE 19801
    Telephone:  (302) 654-7444

– and –

Thomas E Lauria
Fernando J. Menendez, Jr.
Kevin M. McGill
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744

Proposed Attorneys for the Debtors
and Debtors in Possession