# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| QHB HOLDINGS LLC, <u>et al.</u>,[1] | ) | Case No. 09-14312 (    ) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## AFFIDAVIT OF DANIEL S. MACSHERRY IN
## <u>SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS</u>

STATE OF NORTH CAROLINA   )
                               ) ss.:
COUNTY OF WAKE            )

Daniel S. Macsherry, being duly sworn, deposes and says:

1.      On December 4, 2009 (the "Petition Date"), QHB Holdings LLC ("QHB Holdings") and its affiliated debtors and debtors in possession (collectively, the "Debtors"), each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "Bankruptcy Code") in this Court. I am the Executive Vice President and Chief Financial Officer of QHB Holdings and an officer of each of the Debtors.[2] As such, I am familiar with the day-to-day operations, business and financial affairs of all the Debtors.

2.      I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Generation Brands Holdings, Inc. (0247), Quality Home Brands Holdings LLC (0532), QHB Holdings LLC (0554), Generation Brands LLC (1825), Murray Feiss Import LLC (0556), Locust GP LLC (0565), LPC Management, L.L.C. (3596), Light Process Company, L.P. (2730), Sea Gull Lighting Products LLC (8003), Woodco LLC (1169), Tech L Enterprises, Inc. (7690), Tech Lighting L.L.C. (2152), LBL Lighting LLC (1784), and Tech L Holdings, Inc. (0613).

[2] Specifically, I am the Executive Vice President and Chief Financial Officer of Generation Brands Holdings, Inc., Quality Home Brands Holdings LLC, and Generation Brands LLC; Vice President of Generation Brands Holdings, Inc., Tech L Holdings, Inc., Tech L Enterprises, Inc., LPC Management, L.L.C. (the General Partner of Light Process Company, L.P.), Woodco LLC, Murray Feiss Import LLC, Locust GP LLC, and Tech Lighting L.L.C.; and Executive Vice President of Sea Gull Lighting Products LLC and LBL Lighting LLC.

chapter 11 cases and in support of the first day motions and applications (collectively, the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit.

3. This Affidavit is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these cases. Section II sets forth those facts which are most germane to this Court's determination of the Debtors' various First Day Motions and is intended to supplement any other affidavits submitted in direct support of such motions.

**I.**
**BACKGROUND AND EVENTS LEADING TO**
**THE COMMENCEMENT OF THE CHAPTER 11 CASES**

**A.      Overview of Business Operations**

4. As set forth in the organizational chart below, QHB Holdings is wholly owned by Generation Brands Holdings, Inc. ("New QHB").[3] QHB Holdings' wholly owned subsidiary, Quality Home Brands Holdings LLC ("Quality Home Brands"), holds 61.84% percent of the equity interests in Generation Brands LLC ("Generation Brands"), while Tech L Enterprises, Inc. ("Tech L"), a wholly owned indirect subsidiary of Quality Home Brands, holds the remaining 38.16% of the equity interests in Generation Brands.

---

[3]      Prior to the Petition Date, New QHB was formed as a new Delaware corporation with no prior operations. Through a merger between New QHB, as the survivor, and QHB Investors Holdings, Inc., the then current majority owner of QHB Holdings, New QHB now owns 100% of the equity of QHB Holdings. New QHB is a wholly owned subsidiary of a newly formed, Delaware limited liability company, Generation Brands Investors LLC, which, in turn, is owned by the former owners of QHB Holdings and the former owners of QHB Investors Holdings, Inc.



5.    Generation Brands (together with its Debtor and non-Debtor affiliates, the "Company") is a leading manufacturer, importer, marketer and supplier of decorative, functional, and specialty indoor and outdoor lighting products, ceiling fans, low-voltage and line-voltage track lighting systems and other home decor products.  The Company sells over 27,000 distinct residential and commercial lighting products, which it distributes through a diversified multi-channel national network of over 4,000 customers consisting of electrical wholesale distributors, lighting showrooms, selected furniture stores, mail order catalogs and a variety of specialty retailers.  The Company's products are also available at selected home centers and hardware stores such as Lowe's, Menards, HD Supply, The Great Indoors, Ace Hardware and TruServe.

6.      The Company is headquartered in Cary, North Carolina and operates primarily through three business units, each of which has multiple complementary brands that target specific end markets: Murray Feiss Import ("MFI"), Sea Gull Lighting Products ("SGL") and Encompass Lighting Group ("Encompass").

7.      <u>Murray Feiss Import</u>. MFI was founded in 1955 and is headquartered in The Bronx, NY. It was acquired by Quad-C Partners VI, L.P. ("Quad-C") in 2004 and combined with SGL in 2005 to form Quality Home Brands. MFI is comprised of two direct Debtor subsidiaries of Generation Brands, Murray Feiss Import LLC and Locust GP LLC, and two indirect non-Debtor subsidiaries of Generation Brands, MF Real Estate LLC and Locust East 140th Street L.P. MFI is a leading designer, supplier and marketer of residential lighting products serving over 1,500 specialty lighting and furniture stores under the highly-regarded Murray Feiss brand and on a private label basis through Royce Lighting which targets mass-market "big-box" retailers. The products sold under the Feiss and Royce brand names include transitional-styled chandeliers, outdoor lighting, lamps and vanity bath lights. These products are targeted towards the remodeling and custom homebuilder end markets.

8.      <u>Sea Gull Lighting</u>. SGL was founded in 1919 and is headquartered in Riverside, New Jersey. Acquired by the Company in November 2005, it is comprised of four Debtor subsidiaries of Generation Brands—Sea Gull Lighting Products LLC, Woodco LLC, LPC Management, L.L.C. and Light Process Company, L.P. SGL is a leading manufacturer, importer, marketer and supplier of decorative and specialty indoor and outdoor lighting and ceiling fan products serving the electrical wholesale, lighting showroom, homebuilder, and consumer markets. SGL's broad product offerings have enabled it to achieve approximately a 65% market share among the nation's top builders through directed-buy agreements with leading

U.S. homebuilders, including Pulte Homes, KB Home, Lennar, Centex, Standard Pacific and others. Brands sold by the Sea Gull Lighting business unit include Sea Gull Lighting, Monte Carlo Fan Company, Ambiance Lighting Systems, Light Process Company, and Unique Lighting.

9. <u>Encompass Lighting</u>. Founded in 1983, Encompass' predecessor, Tech Lighting, began as a retail showroom in downtown Chicago. In 2005, Tech Lighting combined with LBL Lighting to become Encompass Lighting, a premier designer and manufacturer of architectural lighting systems, which was acquired by the Company in 2006. Encompass is headquartered in Skokie, Illinois and is comprised of two direct and indirect Debtor subsidiaries of Generation Brands—Tech Lighting L.L.C. and LBL Lighting LLC. Encompass is a premier designer and manufacturer of architectural lighting systems serving the residential and commercial end markets with a leading market position in the high growth, low-voltage lighting systems category, with approximately a 50% market share. Encompass is one of the fastest growing and most profitable companies in the industry, with a portfolio of brands including Tech Lighting, LBL Lighting, tiella, 2thousand degrees, T~trak, ELEMENT, and Wilmette Lighting. Encompass offers an extensive line of premium fixtures, low-voltage track lighting, decorative pendants, wall and bath fixtures, chandeliers, and outdoor lighting products.

**B. <u>Capital and Debt Structure</u>**

10. As of September 30, 2009, the Company's consolidated balance sheet reflected total assets of approximately $520 million. Of this amount, approximately $15 million was comprised of cash and cash equivalents, approximately $56 million was comprised of property and equipment, net of depreciation, and approximately $45 million was comprised of inventory. The Company's consolidated balance sheet also reflected total liabilities of approximately $488 million, the vast majority of which was attributable to the First Lien Debt,

the Second Lien Debt and the Notes (each as defined below). As of the Petition Date, the Company estimates that it has approximately $13.4 million in aggregate cash collateral in various bank accounts held at JPMorgan Chase Bank, Wachovia Bank, N.A. and Standard Chartered Bank.

11.     On June 20, 2006, the Company issued $35 million in Senior Notes due 2013 and entered into a First Lien Credit Agreement and Second Lien Credit Agreement, the proceeds of which were used to refinance existing debt and fund the acquisition of Encompass for $285 million.

12.     <u>First Lien Debt</u>.  The First Lien Credit Agreement, dated as of June 20, 2006 (as amended from time to time, the "First Lien Credit Agreement"), by and among QHB Holdings, Quality Home Brands, as borrower, the lenders party thereto (the "First Lien Lenders"), BNP Paribas, as syndication agent, JPMorgan Chase Bank, N.A., as documentation agent, and Bear Stearns Corporate Lending Inc. ("Bear Stearns"),[4] as first lien administrative agent and first lien collateral agent, provided Quality Home Brands with a term loan commitment of $290 million (as amended from time to time, the "First Lien Term Loan") and a revolving loan commitment of $30 million (as amended from time to time, the "First Lien Revolver" and, together with the First Lien Term Loan, the "First Lien Debt").  The First Lien Term Loan matures on December 20, 2012 and the First Lien Revolver matures on June 20, 2012.  The First Lien Debt is guaranteed by QHB Holdings and each of the subsidiaries of Quality Home Brands other than non-Debtors Locust East 140th Street L.P. and MF Real Estate LLC (collectively, the "Guarantors"), and is secured by liens on substantially all of the assets of Quality Home Brands and the Guarantors.  As of the Petition Date, the approximate amounts

---

[4]     Pursuant to that certain First Amendment, dated as of July 29, 2008, to the First Lien Credit Agreement, Bear Stearns was replaced by BNP Paribas as first lien administrative agent and first lien collateral agent.

outstanding under the First Lien Term Loan and the First Lien Revolver were $231.1 million and $8.2 million, respectively.

13.     Second Lien Debt.  The Second Lien Credit Agreement, dated as of June 20, 2006 (as amended from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements"), by and among QHB Holdings, Quality Home Brands, as borrower, the lenders party thereto (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Lenders"), BNP Paribas, as syndication agent, and Bear Stearns,[5] as second lien administrative agent and second lien collateral agent, provided Quality Home Brands with a term loan commitment of $100 million (as amended from time to time, the "Second Lien Term Loan" or the "Second Lien Debt").  The Second Lien Term Loan matures on June 20, 2013.  The Second Lien Term Loan is guaranteed by the Guarantors, and is secured by second liens on substantially all of the assets of Quality Home Brands and the Guarantors.  As of the Petition Date, the approximate amount outstanding under the Second Lien Term Loan was $101.2 million.

14.     Senior Notes.  Pursuant to that certain Note Purchase Agreement by and between QHB Holdings and Apollo Investment Corporation ("Apollo"), dated as of June 20, 2006, Apollo purchased notes issued by QHB Holdings in the aggregate principal amount of $35 million (the "Notes").  Pursuant to the Second Amendment to the Note Purchase Agreement, dated July 2008, the Notes currently accrue interest at 14.5% per annum and are scheduled to mature in December 2013.  The Notes are not guaranteed and are unsecured.  As of the Petition Date, the approximate amount outstanding under the Notes was $54.7 million.

---

[5]     Pursuant to that certain First Amendment, dated as of July 2008, to the Second Lien Credit Agreement, The Bank of New York Mellon replaced Bear Stearns as second lien administrative agent and second lien collateral agent.

### C.     Events Leading to the Commencement of the Chapter 11 Cases

15.     The severe downturn in residential remodeling, which accounts for approximately 80% of the Company's sales, has placed significant pressure on the Company's balance sheet and ability to remain in compliance with its financial covenants. Specifically, in May 2008, certain of the Company's ultimate equity holders, including its majority equity holder, Quad-C, were required to pay approximately $5 million in order to cure certain financial defaults under the First Lien Credit Agreement. Shortly following this payment, in July 2008, the Company sought and obtained amendments to the First Lien Credit Agreement and the Second Lien Credit Agreement, which relaxed certain financial covenants and amended the pricing of those facilities. In exchange for these amendments, the Company lost $10 million in availability under the First Lien Revolver and was required to prepay approximately $20 million of the First Lien Debt which, like the $5 million equity cure, was funded by cash infusions from the Company's equity holders, including Quad-C. Further, the Company agreed to reduce the principal amount outstanding under the First Lien Debt by an additional $15 million, which amounts were paid as required by June 26, 2009 from the proceeds of the sale of an option on certain real estate assets to an affiliate of Quad-C.

16.     Following the amendments to the Credit Agreements, the deterioration in the Company's business accelerated. By the first quarter of 2009, the Company sought and obtained additional covenant relief from the Prepetition Lenders to avoid defaulting under the Credit Agreements. However, the business continued to be negatively affected by the challenging economic environment and, by May 2009, the Company recognized that if the operating environment continued to deteriorate, the Company could potentially face a covenant default later in the year. Furthermore, the Company came to the conclusion that its capital

structure was unsustainable and did not provide the financial flexibility necessary to operate in the current business environment.

17.     Accordingly, in June 2009, the Company engaged Barclays Capital as its financial advisor to explore strategic alternatives to address the Company's over-leveraged capital structure.  Shortly thereafter, the Company also commenced discussions with certain of the Prepetition Lenders and Apollo regarding the terms of a consensual restructuring transaction that could result in significant deleveraging and improved financial flexibility for the Company going forward.

18.     By September 2009, the Company determined that it was unlikely that it would remain in compliance with the financial covenants under the First Lien Credit Agreement. As such, the Company sought and, on September 28, 2009, received a waiver of a payment default and a temporary waiver of certain potential covenant defaults under the First Lien Credit Agreement through November 25, 2009 to allow time for the Company, the Prepetition Lenders and Apollo to continue discussions regarding the final terms and ultimate solicitation of a proposed restructuring.  In connection with the aforementioned waiver, the Company agreed to the elimination of its ability to make additional borrowings under the First Lien Revolver.

19.     Following extensive discussions with a large number of the Prepetition Lenders and Apollo—which, among other things, involved negotiating and finalizing term sheets reflecting the material terms of a proposed restructuring—on November 10, 2009, the Company solicited acceptances of the final form of restructuring proposal (the "Restructuring"), which was set forth in that certain Proposal to Restructure, Disclosure Statement and Solicitation of Acceptances of a Prepackaged Plan of Reorganization (the "Disclosure Statement"), filed concurrently herewith.  As set forth in the Disclosure Statement, the Company sought approval

of the Restructuring—which only modifies the Company's existing capital structure and, as such, does not alter the rights of creditors other than the Prepetition Lenders and Apollo—through a consensual transaction outside of bankruptcy with the unanimous support of the Prepetition Lenders and Apollo (the "Out-of-Court Transaction"), or, if such unanimous consent was not obtained, in accordance with the terms of the prepackaged plan of reorganization (the "Plan") attached to the Disclosure Statement, subject to bankruptcy court approval.

20.     As more fully described in the Disclosure Statement, the Plan generally provides for the satisfaction of (i) the First Lien Debt through the use of certain Cash-Pay Term Loans[6] and PIK Term Loans; (ii) the Second Lien debt through the issuance of New Common Stock of New QHB sufficient to result in an aggregate common equity ownership of New QHB at closing of 91.75% (excluding, for this purpose, shares issuable upon conversion of the New Preferred Stock and shares to be issued under a new Management Incentive Plan) and (iii) the Notes through the issuance of New Common Stock of New QHB sufficient to result in an aggregate common equity ownership of New QHB at closing of 7.50% (excluding, for this purpose, shares issuable upon conversion of the New Preferred Stock and shares to be issued under a new Management Incentive Plan).  Additionally, the Plan provides for Quad-C or its designee to invest $20 million in the Debtors through the purchase of New Preferred Stock on the terms and subject to the conditions of the Preferred Stock Purchase Agreement.  Notably, with the exception of the Prepetition Lenders and Apollo, all of the Company's creditors and equity holders are unimpaired under the Plan.

21.     The deadline to vote to accept or reject the proposed Restructuring (whether effectuated through an Out-of-Court Transaction or through the Plan) expired on

---

[6]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, which has been filed concurrently herewith.

November 25, 2009 at 12:00 noon (Prevailing Eastern Time). Although Apollo and a majority

of the Prepetition Lenders voted in favor of the Restructuring—specifically, the Plan was

accepted by approximately 75% in number and more than 80% in amount of holders of the First

Lien Debt, as well as by more than 81% in number and more than 97% in amount of holders of

the Second Lien Debt that cast ballots on the Plan[7]—a small number of the Prepetition Lenders

voted to reject the Restructuring, thus preventing the Debtors from consummating it through the

Out-of-Court Transaction. To prevent the consequences of defaults under the First Lien Credit

Agreement, preserve the Debtors' business as a going-concern, and restructure their debt in

accordance with the Plan, the Debtors commenced these cases under chapter 11 of the

Bankruptcy Code.

## II.
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

22. Concurrently with the filing of their chapter 11 petitions, the Debtors have

filed the First Day Motions. The Debtors request that the relief requested in each of the First

Day Motions described below be granted, as each request for relief constitutes a critical element

in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all

parties in interest.

### A.      Debtors' Motion for Joint Administration of Cases

23. The Debtors seek the joint administration of their chapter 11 cases for

procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice

---

[7]      The tabulation of votes on the Debtors' Plan is set forth in the Affidavit of Service and Declaration of
James Katchadurian of Epiq Bankruptcy Solutions, LLC Regarding the Mailing, Voting and Tabulation of Ballots
Accepting and Rejecting Joint Prepackaged Chapter 11 Plan of Reorganization for QHB Holdings LLC and its
Affiliated Debtors, which has been filed concurrently herewith.

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). Joint administration will obviate the need for duplicative notices, motions, applications and orders relating to each of the Debtors' separately filed cases, and thereby expedite the administration of these cases and reduce administrative costs for the Debtors, their estates, and this Court without prejudicing the substantive rights of any creditors.

24.     The rights of parties in interest will not be prejudiced by the proposed joint administration of these cases because each creditor may still file its claim against a particular estate. In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

25.     The Debtors believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and all other parties in interest, and should be granted in all respects.

**B.     Debtors' Application for Order Authorizing and Approving the Appointment of Epiq Bankruptcy Solutions, LLC As Noticing, Claims and Balloting Agent for the Bankruptcy Court**

26.     The Debtors seek to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their noticing, claims and balloting agent as of the commencement of these cases (the "Claims, Noticing, and Balloting Agent"). The Debtors have selected Epiq both because of the firm's experience in chapter 11 cases of this size and the reasonableness of its fees.

27.     Epiq has substantial experience in the matters upon which it is to be engaged. The Debtors understand that it is one of the country's leading chapter 11 administrators with vast experience in noticing, claims processing, claims reconciliation, balloting and distributions. Epiq specializes in noticing, claims agent and balloting services, and has a proprietary claims management system in which claims are effectively managed for the

Clerk of the Court. By appointing Epiq as the Claims, Noticing, and Balloting Agent in these chapter 11 cases, parties in interest will benefit from Epiq's significant experience and the efficient and cost-effective methods it has developed.

**C.**     **Debtors' Motion for Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms; (II) Authorizing Continued Postpetition Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

28.     The Debtors seek (a) authority to continue to use the Debtors' existing (i) Cash Management System and Bank Accounts (each as defined below) and (ii) business forms; (b) authority to continue postpetition Intercompany Transactions (as defined below); and (c) a waiver of investment and deposit requirements.

29.     As is typical with most large corporate enterprises, in the ordinary course of their businesses and prior to the Petition Date, the Debtors in large part utilized an integrated cash management system that provides well-established mechanisms for the collection, concentration, management and disbursement of funds used in the Debtors' business operations (the "Cash Management System"). A list of the Debtors' bank accounts (the "Bank Accounts") is set forth on Exhibit "A" to the Cash Management Motion.[8]

30.     Through the Cash Management System, the Debtors are able to monitor their cash position on a daily basis, with disbursements being controlled by the Debtors' financial personnel at Quality Home Brands and the Debtors' three primary business units, as described in greater detail below. Through their Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, efficiently monitor the collection and disbursement of

---

[8]     The Debtors believe that the list of Bank Accounts in Exhibit "A" to the Cash Management Motion includes a complete list of all of the Debtors' bank accounts. However, in the event than one or more of the Debtors' accounts have been inadvertently omitted from Exhibit "A", such accounts are included in the definition of "Bank Accounts."

funds, and maintain control over the administration of the various Bank Accounts required to effect the collection, disbursement and movement of cash.

31.     As reflected in Exhibit "A" to the Cash Management Motion, the Debtors maintain numerous Bank Accounts.  With the exception of two Bank Accounts maintained at Standard Chartered Bank ("Standard") and Wachovia Bank, N.A. ("Wachovia"), respectively, all of the Debtors' Bank Accounts are maintained at JPMorgan Chase Bank ("JPMorgan," and together with Standard and Wachovia, the "Depository Banks").  The Debtors' Cash Management System primarily consists of (a) a master concentration account at JPMorgan in the name of Quality Home Brands, into which substantially all receipts from the Debtors' business operations historically have been swept on a daily basis (the "Master Concentration Account"), and (b) additional concentration, depository, and controlled disbursement accounts in the names of each of the Debtors' three primary business units.

32.     <u>Master Concentration Account</u>.  The Debtors' Cash Management System primarily revolves around the Master Concentration Account, into which substantially all of the funds received by the Debtors are either directly deposited or automatically swept nightly from concentration accounts held by the Debtors' three business units—MFI, SGL and Encompass. The funds deposited in the Master Concentration Account historically have consisted primarily of revenues from the operations of the Debtors and their non-Debtor subsidiaries and other miscellaneous revenues generated from transactions ancillary to the Debtors' business operations, such as tax refunds.  The Debtors also make periodic disbursements from the Master Concentration Account, as required, to fund the controlled disbursement accounts held at MFI, SGL and Encompass in those instances where amounts held in such accounts are insufficient to

cover payments becoming due on any given day.[9]  Such deficit funding, if necessary, is provided

by transfers from the Master Concentration Account to the concentration account of the business

unit that is in need of funding.

            33.    <u>Other Concentration and Depository Accounts</u>.  In addition to the Master

Concentration Account described above, the Debtors' three business units maintain depository

accounts into which substantially all of the funds received by each of those units, including

revenues from their business operations, are directly deposited.  As noted briefly above, these

entities also maintain separate concentration accounts into which all funds held in their

respective depository accounts are either directly deposited or automatically swept on a daily

basis.  Amounts held in the concentration accounts of MFI, SGL and Encompass are first used to

automatically fund the controlled disbursement accounts at each of those entities and, to the

extent there is any surplus remaining, swept to the Master Concentration Account nightly.

            34.    <u>Disbursement Accounts</u>.  Expenses are generally paid from various

controlled disbursement accounts held by the MFI, SGL and Encompass business units (the

"Business Unit Disbursement Accounts") on a daily basis.[10]  Other than a disbursement account

held by Murray Feiss Import LLC d/b/a Royce Lighting at Standard—which is maintained solely

for the purpose of making payments to the Debtors' vendors in China—and a payroll account

held by Sea Gull Lighting Products LLC at Wachovia, all Business Unit Disbursement Accounts

are held at JPMorgan.  Disbursements from the Business Unit Disbursement Accounts are

funded through manual transfers from either the concentration accounts held by MFI, SGL and

---

[9]      All decisions regarding disbursements made from the Master Concentration Account are made by the Debtors' financial personnel at Quality Home Brands.

[10]     All decisions regarding disbursements made from the various accounts held by the Debtors' three business units are made by the financial personnel at each of those units.

Encompass, as applicable, or from the Master Concentration Account, as necessary, and typically include disbursements for the payment of, among other things, (a) operating expenses and other accounts payable, (b) taxes, (c) employee payroll expenses, and (d) other employee-related expenses, including periodic commission payments.

35.    <u>Intercompany Transactions</u>.  Receivables and payables that result from inventory movement are classified by the Debtors as trade receivables and payables; most other advances and transfers between the Debtors and their affiliates are classified by the Debtors as non-trade receivables and payables.  Intercompany transactions that are related to trade items are booked as intercompany payables and are non-interest bearing.

36.    The Debtors intend to continue funding their non-Debtor affiliates' operations, as needed, so long as the Debtors determine that providing such funding in the form of an intercompany transaction would be in the best interests of their estates and creditors.

37.    At any given time, there may be balances due and owing from one Debtor to another Debtor, between Debtors, or between a Debtor and a non-Debtor affiliate.  These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System.  The Debtors have historically maintained records of these cash transfers in their ordinary course and can ascertain, trace and account for all such intercompany transactions.  The Debtors will continue to maintain such records, including records of all intercompany accounts receivable and payable and payments made on behalf of intercompany payables.

38.    The Debtors submit that the cost and expense of creating a new cash management system or changing bank accounts would not only force the Debtors to incur

significant and unnecessary costs and expenses, but would impair the ordinary operation of the Debtors' businesses.

39. Forcing the Debtors to employ a new cash management system and new bank accounts would cause confusion, disrupt payroll, introduce inefficiency at a time when efficiency is most critical and place a strain on the Debtors' relationships with customers and vendors. The Debtors believe these relationships must be maintained if the Debtors are to be given the opportunity to reorganize successfully. Indeed, asking customers to remit payments to new and different accounts will result in a significant slowdown in the Debtors' collection of receipts just at the time when prompt collection is most critical.

40. Similarly, the Debtors, their employees and vendors would suffer great hardship if the Debtors were required to substitute new debtor-in-possession bank accounts for their existing Bank Accounts. Substitution of the Debtors' Bank Accounts would essentially render this Court's approval of the continuation of the intercompany accounting and cash management procedures, if granted, meaningless, and inevitably lead to the same delays, confusion and disruption of the Debtors' businesses, including significant slowdown in the collection of payments from customers, that would result from a discontinuation of the intercompany accounting and cash management procedures.

41. <u>Business Forms</u>. Additionally, the Debtors do not print their own business forms and stationery. Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationery merely to indicate "debtor in possession." Changing the business forms at this critical, early stage of their chapter 11 cases would be expensive and burdensome to the Debtors' estates and present an unnecessary distraction, extremely disruptive to the Debtors' business operations.

42.     _Waiver of Investment and Deposit Requirement_.  Finally, the Debtors request a waiver of the strict application of the requirements of section 345 of the Bankruptcy Code.  The financial institutions at which the Debtors maintain their Bank Accounts are financially stable banking institutions.  All of the Debtors' deposits are prudent and designed to yield the maximum reasonable net return on the funds invested.  As such, the Debtors respectfully request authority to maintain their cash in the Bank Accounts in a safe and prudent manner, in accordance with their existing practices.

43.     By preserving business continuity and avoiding the operational and administrative paralysis that changing the Cash Management System, Bank Accounts, and business forms would necessarily entail, all parties in interest will be best served and the Debtors will benefit considerably from the relief requested in the Cash Management Motion.

**D.     Debtors' Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wage Motion")**

44.     Pursuant to the Wage Motion, the Debtors seek authority to pay certain prepetition obligations owing to the Debtors' employees (as specifically set forth and defined in the Wage Motion, the "Prepetition Employee Obligations").  The Debtors seek authority to honor the Prepetition Employee Obligations as payment of such obligations is critical and essential to employee morale and future business needs.

45.     The Debtors employ approximately 656 employees nationally, as well as approximately 40 employees in China.  The Debtors' employees include approximately 93 mid-level to executive management personnel, 85 technical/professional employees, 174 administrative support personnel, 306 craft workers, operatives and laborers, and 31 sales representatives compensated on either a salary or commission basis.  Additionally, either directly or through various third-party agencies, the Debtors employ approximately 325 contract

employees (the "Contract Employees") who assist with, among other things, sales, product placement and new product development, or provide general labor and administrative support services. The Debtors' employees can generally be divided into each of the Company's three business units – MFI, SGL and Encompass – as well as a subdivision business unit of SGL – Light Process Company ("LPC").

46.     MFI employs approximately 70 full-time employees, including approximately 35 hourly-paid employees and 35 salaried employees. MFI has a labor contract with the Production, Maintenance and Service Employees Union - Local No. 3 AFL-CIO covering approximately 11 employees who are in MFI's parts, rework and maintenance departments.

47.     SGL employs approximately 250 full-time employees, including approximately 170 hourly-paid employees and 80 salaried employees. SGL has a labor contract with United Electrical, Radio and Machine Workers of America covering approximately 59 employees at its Burlington and Riverside, New Jersey facilities.

48.     Encompass employs approximately 300 full-time, non-union employees, including approximately 230 hourly-paid employees and 70 salaried employees.

49.     LPC employs approximately 35 full-time, non-union employees, including approximately 32 hourly-paid employees and three salaried employees.

### *Wages, Salaries, and Other Compensation*

50.     <u>Payroll Obligations</u>.  The Debtors seek to be authorized to honor all outstanding payroll obligations. Approximately 6% of the Debtors' payroll costs represent

compensation paid to "Senior Executives,"[11] with the remaining 94% representing compensation to middle management or rank and file employees.

51.     MFI employees are paid weekly in arrears, with a Sunday payroll close date and a Thursday pay date.  In addition to their normal hourly rates, certain regular hourly-paid non-union employees are eligible for overtime pay in an amount equal to time-and-one-half the employee's normal rate of pay for hours worked in excess of 40 regular hours in one workweek.  Further, all union employees are eligible for overtime pay in an amount equal to time-and-one-half the employee's normal rate of pay for hours worked in excess of 8 regular hours in one workday.  On a monthly basis, MFI's gross payroll averages approximately $678,574.77.  The last regular payroll date for MFI employees was December 3, 2009 (the "Last MFI Payroll").  Due to the lag in payroll, the Debtors estimate that approximately $190,000 in the aggregate has accrued but is not yet due to MFI employees until the next pay date, with no employees owed in excess of $10,950.

52.     SGL employees are paid weekly in arrears, with a Saturday payroll close date and Friday pay date.  In addition to their normal hourly rates, certain regular hourly-paid non-union employees are eligible for overtime pay in an amount equal to time-and-one-half the employee's normal rate of pay for hours worked in excess of 40 regular hours in one workweek.  Further, all union employees are eligible for overtime pay in an amount equal to (a) time-and-one-half the employee's normal rate of pay for hours worked on Saturday and hours worked in excess of 8 regular hours on any weekday and (b) double the employee's normal rate of pay for hours worked on Sundays and company holidays.  On a monthly basis, SGL's gross payroll

---

[11]     As of the Petition Date, the Debtors employed seven "Senior Executives," which, solely for the purposes of the Wages Motion, is defined to include the corporate officers, presidents and chief operating officers for each of the Debtors.  The annual base salaries of the Senior Executives range from $150,000 to $475,000.

averages approximately $1,195,520.93. The last regular payroll date for SGL employees was December 4, 2009 (the "Last SGL Payroll"). Due to the lag in payroll, the Debtors estimate that approximately $240,000 in the aggregate has accrued but is not yet due to SGL employees until the next pay date, with no employees owed in excess of $10,950.

53.     Encompass employees are paid weekly in arrears, with a Sunday payroll close date and Friday pay date. In addition to their normal hourly rates, certain regular hourly-paid employees are eligible for overtime pay in an amount equal to time-and-one-half the employee's normal rate of pay for hours worked in excess of 40 regular hours in one workweek. On a monthly basis, Encompass's gross payroll averages approximately $1,080,000. The last regular payroll date for Encompass employees was December 4, 2009 (the "Last Encompass Payroll"). Due to the lag in payroll, the Debtors estimate that approximately $250,000 in the aggregate has accrued but is not yet due to Encompass employees until the next pay date, with no employees owed in excess of $10,950.

54.     LPC employees are paid either weekly or biweekly in arrears, with a Sunday payroll close date and Wednesday pay date. In addition to their normal hourly rates, certain regular hourly-paid employees are eligible for overtime pay in an amount equal to time-and-one-half the employee's normal rate of pay for hours worked in excess of 40 regular hours in one workweek. On a monthly basis, LPC's aggregate weekly gross payroll averages approximately $52,000 and its aggregate biweekly gross payroll averages approximately $20,000. The last regular payroll date for both weekly and bi-weekly paid LPC employees was December 2, 2009 (the "Last LPC Payroll" and, together with the Last MFI Payroll, the Last SGL Payroll and the Last Encompass Payroll, the "Last Payrolls"). Due to the lag in payroll, the

Debtors estimate that no more than $10,000 in the aggregate has accrued but is not yet due to LPC employees until the next pay date.

55.     In sum, the Debtors estimate that approximately $690,000 in unpaid wages and salary is owing to all of their employees in the aggregate for services rendered prior to the Petition Date.

56.     Due to the timing of the Last Payrolls, payroll checks for some employees who do not receive compensation by direct deposit likely remain in float.  In addition, although the Debtors believe that most payroll checks relating to payroll periods prior to the Last Payrolls have been presented to and honored by the applicable drawee banks, certain employees may fail to cash or deposit their paychecks in a timely manner.  Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction to do so.  Furthermore, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors believe that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise.  The Debtors believe that no employee is owed in excess of $10,950 on account of payroll checks in float.

57.     Vacation, Personal Time Off, and Sick Leave.  In addition to wages and salary, certain of the Debtors' employees accrue paid vacation time and personal time off based on length of service and sick time at a flat rate.  The Company also observes specific paid holidays, and employees may take limited paid time off under certain other circumstances as well.  The Debtors intend to permit employees to continue to use any accrued but unused time off in the ordinary course.

58.  Employee Discount.  SGL, MFI and LPC allow their employees to purchase products at standard cost plus 10% plus freight charges.  Encompass allows its employees to purchase products at 75% off retail cost plus freight charges.  The Debtors intend to permit employees to continue to purchase products at the discounted rate in the ordinary course of business.

59.  Contract Employees.  The Debtors employ approximately 325 individuals as contract employees (the "Contract Employees"), which provide services including, but not limited to, sales, product placement and new product development as well as temporary labor services.  The majority of the Contract Employees are employed by the Debtors through third-party agencies as independent sales representatives, which are paid quarterly on a commission-only basis.  Additionally, approximately 16 Contract Employees are employed by the Debtors through temporary staffing agencies, which provide general labor and administrative support services.  The Debtors believe that these third-party agencies will likely terminate services if they are not paid amounts owing and that such termination would be significantly detrimental to the Debtors' businesses.  Finally, approximately 21 Contract Employees are paid directly by and work solely for the Debtors.  Although such Contract Employees are considered independent contractors as opposed to actual employees for the purposes of applying certain federal, state or local employment, labor, tax and other laws and regulations, their livelihood is dependent on the Debtors and their employment is an integral component of the Debtors' businesses.  The Debtors estimate that no more than $2,985,00 in the aggregate has accrued but not yet been paid to the Contract Employees.

60.  Royalty Obligations.  In addition to wages and salary, four of the Debtors' employees are parties to royalty agreements that require the Debtors to pay them royalties (the

"Royalty Obligations") in connection with the sale of certain products designed by such employees. The Debtors believe the continued sale of these products is critical to ongoing business operations. The Royalty Obligations are paid through payroll either monthly or quarterly and are included in the average gross payroll estimates above. As of the Petition Date, the Debtors estimate that no more than $550,000 in aggregate Royalty Obligations have accrued but not yet been paid.

### *Allowances and Reimbursable Business Expenses*

61.     Car Allowances.  Approximately 6 of the Debtors' employees that are required to travel frequently in the course of their employment are provided with a regular monthly car allowance ranging from approximately $850 to $1,500 each (the "Car Allowances"). The Car Allowances are designed to cover the costs of gas, wear and tear, and maintenance for the employees' personal vehicles, and are included in the Debtors' regular payrolls. On a monthly basis, the Debtors pay approximately $6,400 in Car Allowance expenses.

62.     Reimbursable Business Expenses.  Prior to the Petition Date and in the ordinary course of their businesses, the Debtors reimbursed employees for certain business expenses incurred in the scope of their employment. Based upon historical averages, approximately 50 employees incur expenses monthly aggregating on average $25,000, relating to, among other things, business related travel expenses, business meals, car rentals and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred on the Debtors' behalf in connection with employment by the Debtors and in reliance by the Debtors' employees that such expenses would be reimbursed. Although the Debtors believe they are current on prepetition Reimbursable Expenses, it is likely that a modest amount of Reimbursable Expenses remains owing due to the lag time between when an employee incurs an expense and when the employee submits a request for

reimbursement. The Debtors estimate that, as of the Petition Date, the total amount owed for Reimbursable Expenses is no more than $30,000, with no one employee estimated to receive in excess of $7,900.

***Employee Benefits***

63.     In the ordinary course of their businesses, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, dental, prescription, disability and life insurance, and other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below.

64.     <u>Health, Dental, and Vision Insurance</u>. An important element of the Employee Benefits is medical, dental and similar health insurance. The Debtors maintain several self-insured and premium-based insurance plans, as further described below.

65.     The Debtors maintain self-insured medical plans (including prescription drug and vision benefits) (collectively, the "Self-Insured Plans") for all of their employees, which are administered by Blue Cross/Blue Shield (the "Self-Insured Medical Plan Administrator"). In conjunction with the Self-Insured Plans, the Debtors maintain a stop-loss policy that limits liability under the Self-Insured Plans to a maximum of $160,000 per employee incident and $6,000,000 in the aggregate. The cost of the stop-loss policy is approximately $120,000 per year and is paid monthly. The average monthly cost of the Self-Insured Plans is approximately $468,000, of which approximately $100,000 is paid by the employees through direct payroll deductions with the remainder borne by the Debtors.

66.     MFI maintains a premium-based dental plan for its employees administered by Aetna Dental, for an average monthly cost of $2,625. SGL maintains a premium-based dental plan for its union employees administered by Delta Dental, for an average

monthly cost of $1,015. SGL and LPC maintain self-insured dental plans for their non-union employees administered by the Maksin Group (the "Self-Insured Dental Plan Administrator" and, together with the Self-Insured Medical Plan Administrator, the "Self-Insured Plan Administrators"), for an average monthly cost of $650. Finally, SGL maintains premium-based supplemental vision coverage for certain of its eligible employees administered by Guardian Insurance, for an average monthly cost of $1,650.

67.     After a claim has been filed with the Self-Insured Plan Administrators and processed, the Debtors, through the Self-Insured Plan Administrators, either (a) reimburse the employee for the cost of the services, or (b) pay the health or dental benefits provider for services rendered to the employee (together, the "Self-Insured Claims"). Payments of the Self-Insured Claims are made by the Self-Insured Plan Administrators through an account that is funded monthly by the Debtors.

68.     Ordinarily, there is lag time between the time when an employee submits a claim and the time when a claim is paid by the Self-Insured Plan Administrators (the "Pipeline Claims"). If the Debtors fail to pay any Self-Insured Claim, the employee is generally directly liable to the provider. Based upon an average of the most recent months prior to the Petition Date, the projected Self-Insured Claims, including any Pipeline Claims, paid by the Debtors total in the aggregate approximately $11,000 on a monthly basis.[12] Due to the historical lag in the payment of Pipeline Claims, the Debtors estimate that approximately $5,000 of accrued but unpaid Pipeline Claims remain owing as of the Petition Date.

---

[12]     Unpaid Self-Insured Claims, Pipeline Claims, or other health benefits include the claims of former employees, many of which have elected to continue coverage under COBRA. Solely for the purposes of paying Self-Insured Claims and Pipeline Claims, the Debtors believe that it is appropriate to include the claims of former employees.

69.     <u>Life, AD&D, and Disability Insurance</u>.  The Debtors provide eligible full-time employees with fully funded life, accidental death and dismemberment and short term disability insurance.  SGL also provides certain eligible full time employees with a long term disability insurance plan.  The approximate average monthly costs to the Debtors are as follows: $12,150 for life, accidental death and dismemberment and short term disability insurance, and $2,600 for long term disability insurance.  The Debtors believe that they are current on all such payments.

70.     <u>Workers' Compensation</u>.  The Debtors maintain a workers' compensation policy to cover injuries sustained by their employees during the policy year.  The policy is a loss-sensitive retro program.  At the beginning of each policy year, a premium is initially paid in the form of a deposit.  At the end of each policy year, losses are valued and the premium is adjusted accordingly.  The actual adjusted premium cannot exceed a capped amount each year, thus limiting the Debtors' ultimate liability.  For the April 1, 2008 through April 1, 2009 policy year, the actual premium exceeded the deposit premium by approximately $434,000, which amount is required to be paid by January 11, 2010.  The Debtors have already paid the premium deposit for the April 1, 2009 through April 1, 2010 policy year, and do not expect that the actual premium for such policy year will exceed the deposit premium.

### *401(k) Contributions*

71.     MFI, SGL, Encompass and LPC offer all of their eligible employees an opportunity to participate in 401(k) plans (the "401(k) Plans").  Under the 401(k) Plans for MFI, SGL and LPC, the employees may contribute an amount of their gross compensation not to exceed the maximum dollar amount set by federal regulations, but are not automatically enrolled for any contributions.  Under the 401(k) Plan for Encompass, employees may contribute up to 60% of their gross compensation not to exceed the maximum dollar amount set by federal

regulations, and the employees are automatically enrolled for 6% contributions unless and until they opt out. The Debtors submit that it is essential for the morale and maintenance of trust of the employees that necessary steps are taken to protect the employees' 401(k) Plans.

### *Education Assistance*

72.     SGL provides tuition reimbursement (the "Education Assistance") for full-time employees who have been employed for at least one year. The amount of Education Assistance an employee may receive is limited to $2,500 per calendar year. SGL projects to spend approximately $2,500 on account of Education Assistance in 2009.

### *Severance Benefits*

73.     Prior to the Petition Date, the Debtors provided severance benefits (the "Severance Benefits") to their employees who were not otherwise party to a formal severance agreement. Pursuant to the Debtors' prepetition practices, upon severance, employees were entitled to receive a limited extension of medical and dental insurance as well as between two to twenty-six weeks' pay, based upon the employee's length of service and position, what business unit the employee worked for, whether the employee was on salary or paid on an hourly basis, and whether the employee was covered by a labor agreement.[13] The Debtors submit that it is essential for the morale and maintenance of trust of the employees that necessary steps are taken to protect the Severance Benefits, particularly with respect to the Debtors' rank and file employees during the initial stages of these cases.[14] The Debtors believe that authorization to

---

[13]     Pursuant to the terms of their labor agreement, however, SGL union employees are not entitled to severance pay.

[14]     Certain of the Debtors' employees, including Senior Executives, may be covered by formal severance agreements. At this time, however, the Debtors are not seeking to assume or make any severance payments under these agreements.

pay the Severance Benefits will allay the employees' fears relating to the bankruptcy filing and protect the Debtors against costly employee lawsuits.

### *Administrative Service Providers*

74.     As is customary in the case of most large companies in the ordinary course of their businesses, the Debtors use third parties to administer employee benefit plans and payroll services (the "Administrative Service Providers"). Specifically, the Debtors use ADP and Paychex to process payroll and Standard Insurance, Geller Group, John Hancock and DeMarco, Kinnaman, Lewis & Co. to administer the 401(k) Plans. The Debtors estimate that the average monthly cost of these services is approximately $12,000 in the aggregate. The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors believe that they are current with respect to amounts owing to Administrative Service Providers; however, to the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized to pay such amounts.

### *Withholdings From Employee Paychecks*

75.     The Debtors deduct certain amounts from their employees' paychecks for the payment of the employee portion of medical and dental insurance premiums; voluntary life and dental insurance; 401(k) deductions; and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

76.     The Debtors may also be in possession of various withholdings, such as payroll taxes, social security, unemployment, garnishments, child support payments, etc.

(together with the Employee Deductions, the "Deductions"). It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients. The Debtors seek authority to forward the Deductions to the appropriate parties. Without such authority, the Debtors expose their officers and directors to personal liability.

77. The Debtors' employees are an essential component of a successful reorganization. Any deterioration in employee morale and welfare at this critical time undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize. For the foregoing reasons, the Debtors believe that it is in the best interests of the estate to grant the relief requested by the Wage Motion.

E. **Debtors' Motion for Authority to Pay Prepetition Trust Fund Taxes in the Ordinary Course of Business (the "Trust Fund Taxes Motion")**

78. The Debtors seek entry of an order authorizing the Debtors to pay prepetition sales, use, excise, employee-related withholding, license and other trust fund type taxes and other trust fund type taxes (however denominated, the "Trust Fund Taxes") to the appropriate federal, state, local and foreign taxing authorities (each, a "Taxing Authority") in the ordinary course of business, as such payments become due and payable and to the extent adequate funds are available to make such payments. The Debtors seek authority to pay the Trust Fund Taxes to avoid the serious disruption to their reorganization efforts that would result from nonpayment of such taxes.

79. In the ordinary course of business, the Debtors collect Trust Fund Taxes from their customers, employees and other parties, and subsequently remit such taxes to the appropriate the appropriate Taxing Authority. For instance, the Debtors withhold certain taxes (including FICA and Medicare taxes) from their employees' paychecks, which amounts are

remitted periodically to the appropriate federal, state and local Taxing Authorities. The Debtors may also be responsible for remitting use taxes to the appropriate Taxing Authorities on personal property and certain related services. These use taxes primarily arise from the purchase of goods outside of the states where the Debtors operate. The process by which the Debtors remit the Trust Fund Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is to be paid.

80.     There is often a lag-time between the time when the Debtors incur an obligation to pay the Trust Fund Taxes and the date when payment of such taxes is due. Various governmental units may therefore have claims against the Debtors for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date. The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer. The Debtors estimate that the total amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities will not exceed $300,000.

81.     Because the Trust Fund Taxes do not constitute estate property, their payment will not adversely affect the Debtors or their creditors. Moreover, many Taxing Authorities impose personal liability on the officers and directors of corporations to the extent such taxes are collected but not remitted. The Debtors' officers and directors may be subject to civil or even criminal liability as a result of such non-payment. The prosecution of such actions during the pendency of these cases would be a significant distraction, and therefore, be detrimental to the Debtors' reorganization efforts.

82.     Additionally, some, if not all, of the agencies collecting taxes may audit the Debtors if such taxes are not paid forthwith. Such audits needlessly would divert the

Debtors' attention away from the reorganization process and diminish their estates. The Trust Fund Taxes represent a relatively de minimis portion of the Debtors' unsecured liabilities.

83.     Accordingly, the Debtors seek authority to continue to pay such Trust Fund Taxes in full in the ordinary course of business. The Debtors believe that granting the relief requested in the Trust Fund Taxes Motion is appropriate and in the best interest of the Debtors, their estates and their creditors.

**F.      Debtors' Motion for an Interim and Final Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service to the Debtors, (II) Deeming Utility Companies Adequately Assured of Future Payment and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

84.     The Debtors seek entry of an order (a) prohibiting the Utility Companies (defined below) from altering, refusing or discontinuing service to the Debtors, (b) deeming the Utility Companies adequately assured of future payment and (c) establishing procedures for determining requests for additional adequate assurances of payment.

85.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telephone and similar services (together, the "Utility Services") from many different utility companies. A list identifying the utility companies providing services to the Debtors is annexed to the Debtors' Utility Motion as Exhibit "A" (such utility companies together with any utility companies inadvertently excluded from Exhibit "A," the "Utility Companies").

86.     Historically, the Debtors have paid all amounts owing to the Utility Companies on a timely basis. To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services, except where the commencement of these chapter 11 cases may have interrupted some of these payments. Prior to

the Petition Date, the average aggregate monthly cost of Utility Services for all of the Debtors was approximately $112,855.

87.     The Debtors maintain operations in multiple locations throughout the United States.  Because of the scope of the Debtors' operations, it is essential that the Utility Services continue uninterrupted.  If the Utility Companies are permitted to terminate Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized.

88.     The Debtors have proposed to provide adequate assurance of payment for future services to the Utility Companies by placing a deposit (a "Utility Deposit") with certain of the Utility Companies in an amount equal to 50% of the Debtors' estimated cost of monthly utility consumption for each such Utility Companies.  The aggregate amount of all such deposits for the Utility Companies listed on Exhibit "A" to the Debtors' Utility Motion would be approximately $56,427.50.

89.     The Debtors submit that granting the relief requested in the Utility Motion is both necessary and appropriate to avoid any harm to their businesses.  The relief requested in the Utility Motion will afford the Debtors an opportunity to successfully reorganize and will not prejudice the rights of any of the Utility Companies.

**G.     Debtors' Motion for Authority to Pay Certain Prepetition Claims of Vendors and Service Providers in the Ordinary Course of Business (the "Prepetition Vendors Motion")**

90.     The Debtors seek authority to pay the liquidated, non-contingent, prepetition claims (the "Prepetition Vendor Claims") owed to the Vendors (as defined below) in the ordinary course of business.

91.     In the ordinary course of their business, the Debtors rely on certain third-party vendors and service providers to supply goods, materials and services that the Debtors

cannot operate without or cannot replace without incurring exorbitant costs (collectively, the "Vendors"). The essential goods and services provided by these Vendors include, among other things, raw materials and components that are critical to the manufacturing process, common carrier, and warehousing and logistics services for the storage and shipment of products, and professional and consulting services that are not otherwise subject to fee applications under the Bankruptcy Code or the Plan. The Debtors believe that some of the Vendors may refuse to continue to provide essential goods and services if the Debtors do not promptly pay prepetition amounts outstanding.

92.     The Debtors' inability to maintain their existing relationships with their Vendors could cause production disruptions if such parties cease providing goods and services even for a short period of time. In many instances, the Vendors represent the sole source providers of such goods or services or are otherwise not replaceable in a timely and cost effective manner. The Debtors, for example, do business with numerous Vendors without the benefit of contracts. Such Vendors are not obligated to honor particular trade terms or to continue to do business with the Debtors going forward.

93.     In addition to not being contractually bound to perform, certain Debtors' Vendors, such as shippers, for example, may be secured creditors as a result of their ability to assert liens against the Debtors' property. Additionally, a large percentage of the Debtors' existing payables to Vendors are on account of goods sold to the Debtors in the ordinary course of business within 20 days of the Petition Date and, as such, I have been informed that these Vendors may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code. The Debtors also rely on numerous foreign Vendors located in China, Taiwan, Hong Kong, Italy, Germany, Austria, Czech Republic and Canada, for, among other things, the

procurement of raw materials, components and finished lighting products. Given that most of these Vendors are located exclusively outside of the United States, such Vendors may not be subject to the jurisdiction of this Court and may be unwilling to continue to do business with the Debtors absent the timely payment of their Prepetition Vendor Claims.

94.     Given that the Debtors operate in a highly-competitive industry, where supply-chain excellence is critical in maintaining market share, any discontinuity in the provision of the essential goods and services provided by the Vendors could have a severe detrimental impact upon the Debtors' estates, as well as on the timely fulfillment of orders, the integrity of the Debtors' reputation, and, ultimately, the loyalty of their clients.

95.     As of the Petition Date, the Debtors estimate the aggregate amounts owed to Vendors to be no more than $6 million. Of that total, the Debtors estimate that approximately half is owed to the Debtors' foreign Vendors. The Debtors further estimate that approximately $2.8 million of the total amount of Prepetition Vendor Claims may be entitled to priority under section 503(b)(9) of the Bankruptcy Code.

96.     The Debtors' prepackaged Plan was prepared and negotiated in an effort to effectuate a comprehensive reorganization of the Debtors' capital structure, while having as limited an impact on the Debtors' ongoing business operations as possible. To that end, the Plan leaves unimpaired all allowed Priority Claims, Administrative Claims, General Unsecured Claims and other Secured Claims (each such term is defined in the Plan) to ensure minimal disruption to the Debtors' business operations as a result of the chapter 11 process. Additionally, the Debtors' prepackaged Plan has been accepted by an overwhelming majority of those creditors that are impaired and thus authorized to vote under the Plan. Given that the Plan is strongly supported by the Debtors' major creditor constituencies—i.e., the First Lien Lenders,

the Second Lien Lenders and Apollo—the Debtors, consistent with the ultimate goal of preserving their business while effectuating the restructuring, are seeking authority to pay the Prepetition Vendor Claims in the ordinary course of business amounts that they would otherwise be entitled to receive upon consummation of the prepackaged Plan. The Debtors submit that the payment of such Claims in the ordinary course will preserve their enterprise value for all parties in interest and is entirely consistent with the terms of the Plan that has been approved by the Debtors' creditors.

97.     Although the Debtors seek authorization to pay Prepetition Vendor Claims in the ordinary course of business, the Debtors seek to pay no more than $6 million of such claims. Further, the Debtors propose that they be authorized to pay the Prepetition Vendor Claims in the ordinary course of business subject to the following conditions (the "Claim Payment Conditions"):

    i.    By accepting payment on account of its Prepetition Vendor Claim, the Vendor must continue doing business with the Debtors in the ordinary course according to terms no less favorable to the Debtors than those in place prior to the Petition Date;

    ii.    The claimant must waive its right to file or otherwise assert against any or all of the Debtors, their estates, or the Debtors' customers, any claim or lien related to any prepetition amounts allegedly owed to the Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date;

    iii.    To the extent the Vendor has already obtained or asserted any such claim or lien, it must take all necessary actions to withdraw such claim or lien; and

    iv.    To the extent that a Vendor paid pursuant to any order entered on the Prepetition Vendors Motion refuses to continue doing business with the Debtors in the ordinary course, it must immediately disgorge any payments made on account of its Prepetition Vendor Claims to the Debtors' estates.

98.     The Debtors submit that the relief requested in the Prepetition Vendors Motion is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

**H.     Debtors' Motion for Authority to Honor and Maintain Certain Customer Programs (the "Customer Programs Motion")**

99.     The Debtors request the entry of an order authorizing the Debtors to (i) honor and maintain prepetition customer program commitments, including warranty commitments, in the ordinary course and (ii) honor or pay related prepetition obligations to their customers.

100.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to develop and sustain positive reputations with their customers and in the marketplace for their products (collectively, the "Customer Programs").

101.     <u>Customer Rebates.</u>  Such practices include, among others, various customer rebate and allowance programs (the "Customer Rebates").  The Customer Rebates primarily consist of discounts provided by the Debtors to certain high volume customers, ranging from 1% to 5%, depending on sales volumes and market conditions.  Specifically, in a typical rebate program, the Debtors provide stair-step percentage rebates based on a particular customer's sales volume for the Debtors' products during a defined period.  Customer Rebates are generally issued by credit memorandum on an annual basis, and in a few cases on a quarterly basis.[15]  The Debtors estimate that they owe, among other amounts related to the Customer Programs, approximately $1,648,000 in accrued but unpaid Customer Rebates as of the Petition Date.

---

[15]     In one case, the Debtors do not issue a credit, but instead issue checks on a monthly basis in the approximate amount of $4,000.

102.     Special Discounts.     In addition to the Customer Rebates, the Debtors

provide various other discount programs (the "Special Discounts") to customers, including: (a)

discounts for placing orders within defined time parameters; (b) discounts for high volume

orders; (c) discounts related to sales of new product lines, (d) discounts or allowances relating to

freight charges, (e) discounts or allowances relating to store service fees and (f) discounts or

allowances relating to showroom openings.     The Debtors believe that they are current with

respect to all Special Discount obligations as of the Petition Date.

103.     Advertising Co-ops.     The Debtors participate in certain cooperative

advertising programs (the "Advertising Co-ops") with various customers, whereby the Debtors

contribute to advertising costs incurred in connection with marketing the Debtors' products.

Examples of Advertising Co-ops include, but are not limited to, providing percentage or flat

amount price reductions to certain high volume retailers in exchange for advertising the Debtors

products in newspapers, catalogs, storefronts, etc.  This program can work one of two ways.  In

one version of the program, customers earn dollars based on their sales and the Debtors accrue

for the dollars earned.  In the other version, the Debtors' sales staff has the discretion to agree to

share half the cost of advertising the Debtors' products in a local market.  In that event, the

showroom will send a copy of the advertising invoice to the Debtors who will then approve the

payment of 50% to the showroom to reimburse half the cost of the advertisement.  The Debtors

estimate that they owe approximately $197,000 in accrued but unpaid Advertising Co-ops as of

the Petition Date.

104.     Customer Returns.     The Debtors offer "Customer Returns" programs for

various customers, whereby the Debtors accept the return of product, or cover the value of

markdowns given at the retail level, under certain limited circumstances.  The Debtors estimate

that they owe approximately $1,000,000 in accrued but unpaid Customer Returns as of the Petition Date.

      105.   <u>Warranty Programs.</u>  Finally, in the ordinary course of business, the Debtors provide their customers with limited warranties to repair manufacturing defects in their products (the "Warranty Programs"). Without question, these warranties add value to the Debtors' business. Responding promptly to customer repair demands after purchase and/or installation enhances the Debtors' reputation for quality and service, which ultimately leads to significant repeat and referral business. Under the typical Warranty Program, the Debtors, at their discretion, repair, replace or refund the purchase price of defective products for the one-year period after the date of purchase. The Debtors' costs under their Warranty Programs have historically been *de minimis* compared to the amount of goodwill generated by the programs. Therefore, the Debtors estimate that very few of the Debtors' warranties will have significant prepetition obligations that would need to be satisfied during these chapter 11 cases.

      106.   The common goal of the Customer Programs is to meet competitive pressures, ensure customer satisfaction, and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability. Moreover, substantially all of the discounts and allowances made under the various Customer Programs require no outlay of cash by the Debtors. Instead, the Company will issue a credit to the customer to be used in conjunction with future payments they send to the Company or the customers simply deduct these amounts from payments they send into the Company on account of open receivables. Accordingly, honoring the Customer Programs may require minimal cash payments, if any, by the Debtors for discounts and rebates accrued prior to the Petition Date. As discussed above, the Customer Programs are critical to the success of the Debtors' business.

107.     The availability of Customer Programs helps make the Debtors' products

more attractive to the customers, helps instill confidence in the Debtors' commitment to

customer satisfaction and generally enables the Debtors to remain competitive in their industry.

The Debtors believe that the maintenance of their Customer Programs (including modifying

existing programs and introducing new programs that are similar in scope and expense to

existing programs) is well within the ordinary scope of their business operations.  Nevertheless,

because the Debtors anticipate that these chapter 11 cases may create some apprehension with

customers as to the scope of the Debtors' authority to continue offering their Customer

Programs, the Debtors seek specific authority to continue the Customer Programs in the Debtors'

discretion and in the ordinary course of business.

**I.      Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(A), 361, 362,
         363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 for
         (A) an Interim Order (1) Authorizing Consensual Use of Cash
         Collateral and Providing for Adequate Protection, (2) Modifying the
         Automatic Stay, (3) Scheduling a Final Hearing; and (B) a Final
         Order (1) Authorizing Incurrence by the Debtors of Postpetition
         Secured Indebtedness with Priority Over all Secured Indebtedness
         and with Administrative Superpriority, (2) Granting Liens, (3)
         Authorizing the Debtors' Consensual Use of Cash Collateral and
         Providing for Adequate Protection, and (4) Modifying the Automatic
         Stay (the "Cash Collateral and DIP Motion")**

108.     The Debtors request entry of (A) an interim order (the "Interim Order")

(1) authorizing the interim use of Cash Collateral (as defined below) on an consensual basis and

interim basis on the terms set forth in the Interim Order; (2) granting "adequate protection" to

the Pre-Petition Secured Parties (as defined below); (3) modifying the automatic stay as imposed by

section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the

terms of the Interim Order; and (4) scheduling a final hearing with respect to the relief requested

(the "Final Hearing"); and (B) a final order (the "Final Order"): (1) (a) authorizing the Debtors to

enter into a $20,000,000 senior secured, superpriority debtor-in-possession financing facility,

including a $5,000,000 letter of credit facility (as amended, modified or otherwise in effect from time to time, the "DIP Facility"), pursuant to the terms set forth in the debtor-in-possession credit agreement attached to the Final Order (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Credit Agreement," together with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to or in favor of the DIP Secured Parties (as defined in the Cash Collateral and DIP Motion), the "DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP Superpriority Claims (in each case, as defined Cash Collateral and DIP Motion); (2) authorizing the use of Cash Collateral on a consensual and final basis and authorizing the repayment of certain prepetition first lien loans with a portion of the proceeds of the DIP Facility; (3) granting adequate protection to the Pre-Petition Secured Parties and (4) modifying the automatic stay under section 362 of the Bankruptcy Code to implement the terms of the DIP Facility.

109. As set forth above, the Debtors have already filed a proposed prepackaged Plan and related Disclosure Statement, solicitation of which has already been completed. Assuming the Court approves such Disclosure Statement and confirms the Debtors' prepackaged Plan on the schedule proposed by the Debtors, the Debtors are seeking to emerge from chapter 11 within approximately two months.

110. To achieve and confirm these highly-negotiated and carefully-constructed prepackaged chapter 11 cases, the Debtors require cash that comprises the cash collateral of the lenders (the "Cash Collateral") under the Debtors' first and second lien prepetition secured credit facilities (collectively, the "Pre-Petition Secured Parties"), and the proceeds of the $20 million DIP Facility, mainly to fund day-to-day operations and maintain and preserve the Debtors' assets, in all cases for the benefit of the Debtors' estates and creditors, including the Pre-Petition

Secured Parties.  The availability to the Debtors of sufficient working capital and liquidity to finance their operations is vital to their ability to maintain their operations and is necessary for the preservation and maximization of their estates as a whole, pending their contemplated reorganization.

111.    The Debtors seek during the interim period authority only to use Cash Collateral pursuant to the terms of the Interim Order.  The Debtors seek to enter into the proposed $20 million DIP Facility only on a final basis after the Final Hearing.

112.    The proposed financing is being requested for only a short period of time, as the Debtors contemplate exiting chapter 11 within approximately two months.  Despite the proposed expedited term of the chapter 11 cases, however, such financing is critical to the Debtors' operations and their ability to preserve their assets.  As indicated above, the proposed financing under the DIP Facility (the "DIP Financing") was negotiated as part of the Debtors' prepackaged bankruptcy.  If the Debtors are unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized.

113.    Among other things, the Debtors need to assure their existing and future customers of their ability to operate in chapter 11 in the ordinary course.  Moreover, the liquidity to be provided pursuant to the DIP Facility is necessary for the Debtors' continued existence as a going concern, particularly at this critical juncture when the Debtors must continue to service and maintain the confidence of their patrons and suppliers and assure them that the Debtors' businesses will remain viable despite these chapter 11 cases.  Without access to the proceeds of the DIP Facility and authorization to use Cash Collateral, the Debtors' vendors and suppliers may hesitate to continue to do business with them on customary terms.

114. Accordingly, the Debtors have an immediate need to use Cash Collateral and will also need to access the DIP Facility in the next few weeks in order to continue their operations without impairment and complete the restructuring process on the proposed expedited basis. Moreover, authorization to use Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors, pending the Final Hearing.

115. Substantially all of the Debtors' assets are subject to liens asserted by the Pre-Petition Secured Parties. Because of the Debtors' substantial amount of pre-petition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Pre-Petition Secured Parties, was not a viable option, especially from a third party who did not already have a financial interest in the Debtors to protect. Moreover, the Pre-Petition Secured Parties would not have consented to the granting of senior or pari passu liens to a new third party debtor-in-possession lender. In fact, the DIP Financing here is part of the Debtors' prepackaged bankruptcy, the terms of which were heavily negotiated by, among others the Pre-Petition Secured Parties. The Debtors thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable. Indeed, the Debtors believe the interest rates under the DIP Facility are likely below market, and thus, an integral component of the Debtors' restructuring efforts.

### *Repayment of the Pre-Petition Revolving Loans Should Be Authorized*

116. The repayment of the Pre-Petition Revolving Loans (as such term is defined in the Cash Collateral and DIP Motion) is supported by sound business judgment. First, no alternative structure for the DIP Facility was available that did not include repayment of the Pre-Petition Revolving Loans. Second, the Pre-Petition Revolving Loans are secured by senior liens, which cannot be primed without the First Lien Lenders' consent or an expensive and

highly uncertain priming fight with the First Lien Lenders. Third, the total amount of Pre-Petition Revolving Loans outstanding is only $8.2 million (a small portion of the Debtors' outstanding prepetition first lien obligations, which total approximately $240 million). Fourth, as set forth herein, the proposed DIP Facility is a $20 million borrowing base facility. Thus, the revolving loans being repaid will be available to be re-borrowed under the DIP Facility, <u>along with $12 million of additional incremental availability</u>. As discussed above, the proposed financing is critical to enabling the Debtors to consummate these prepackaged chapter 11 cases. Importantly, it should be noted that under the prepackaged Plan, the DIP Facility is proposed to be rolled into an exit facility. So, the conversion of the Pre-Petition Revolving Loans to loans under the DIP Facility will <u>not</u> result in the cash payment of such amount if the prepackaged Plan is confirmed. Moreover, approval of the Final Order, including the permanent reduction and repayment of the Pre-Petition Revolving Loans is a condition precedent to the initial extension of credit under the DIP Facility. Without approval of such repayment of the Pre-Petition Revolving Loans, the Debtors' ability to access the proceeds of the DIP Facility is jeopardized as is their ability to obtain the proposed exit facility and consummate the proposed prepackaged Plan that was accepted by an overwhelming majority of the First Lien Lenders. For the foregoing reasons, the Debtors respectfully submit that under the foregoing circumstances, the repayment of the Pre-Petition Revolving Loans should be approved.

### *The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estates*

117.     The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtors' ongoing operations during the expedited term of the chapter 11 cases and will signal the Debtors' continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued

support of the Debtors' customers and critical suppliers. Furthermore, based upon the Debtors'

evaluation of comparable debtor-in-possession loans, the interest rates and fees appear to be

consistent with or better than the existing market for debtor-in-possession loans of this nature.

The Debtors believe that the proposed DIP Facility is the best financing available and well

within the exercise of sound business judgment.

118. Moreover, as stated above, the terms of the DIP Facility and the Final

Order were negotiated in good faith and at arm's length between the Debtors and the proposed

lenders under the DIP Facility.

### *The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized*

119. The Court should authorize the Debtors to use Cash Collateral, whether

existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash

collateral into cash. It is essential to the continued operation of the Debtors that they obtain

authority to use Cash Collateral to fund payroll and other operating needs, including the costs of

administration of the chapter 11 cases. Currently, the Debtors have little or no available cash or

assets readily convertible into cash that are not likely subject to the Pre-Petition Secured Parties'

asserted liens and security interests.

120. If the Debtors are permitted to use Cash Collateral to fund ongoing

business operations and administration of these chapter 11 cases, the Debtors will preserve the

value of the Debtors' assets as a going concern. Thus, the Debtors can continue to run their

business successfully, but only if they are allowed to use Cash Collateral in the course of their

day-to-day operations. Without such use, the detrimental result to the estate will be rapid and

ultimately disastrous, given the nature of the Debtors' business. Access to Cash Collateral is

crucial to the Debtors' ability to avoid immediate and irreparable harm to their estates, creditors,

and ongoing businesses both before and after the Final Hearing.

121.    The Debtors respectfully submit that the proposed use of Cash Collateral, in conjunction with the DIP Facility, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve their assets and property.  The Debtors' proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Pre-Petition Secured Parties, and enhances the prospects of a successful outcome of the chapter 11 cases.

122.    If the Debtors are unable to obtain approval of the use of Cash Collateral on an interim basis and the use of Cash Collateral and approval of the DIP Facility on a final basis, their ability to consummate their carefully constructed prepackaged bankruptcy will be jeopardized, reducing recoveries to all creditors.  Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order, is therefore (i) critical to the Debtors' ability to reorganize, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation and employees.  Furthermore, access to the Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing. The Debtors, therefore, respectfully request that the Cash Collateral and DIP Motion be granted.

**J.      Motion of the Debtors for an Order: (I) Scheduling a Combined Hearing to Consider: (A) Approval of the Disclosure Statement, (B) Approval of the Prepetition Solicitation Procedures and Form of Ballots, and (C) Confirmation of the Prepackaged Plan; (II) Establishing Deadlines and Procedures to Object to the Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of: (A) Commencement of the Chapter 11 Cases and (B) the Combined Hearing; (IV) Directing the Office of the United States Trustee to Not Convene a Meeting of Creditors; and (V) Granting <u>Related Relief (the "Combined Hearing and Scheduling Motion")</u>**

123.     The Debtors request entry of an order (i) scheduling a combined hearing (the "Combined Hearing") to consider: (a) approval of the Debtors' Disclosure Statement, (b) approval of the prepetition solicitation procedures (the "Solicitation Procedures") and forms of voting ballots, and (c) confirmation of the prepackaged Plan; (ii) establishing deadlines and procedures for filing objections to the adequacy of the Disclosure Statement and the Solicitation Procedures, and confirmation of the prepackaged Plan; (iii) approving the form and manner of notice of: (a) the commencement of the chapter 11 cases and (b) the Combined Hearing; (iv) directing the Office of the United States Trustee to not convene a meeting of creditors; and (v) granting related relief.

124.     The Debtors engaged Epiq to act as their voting and solicitation agent (the "Solicitation Agent") for the purpose of distributing the Disclosure Statement, the prepackaged Plan and the customized ballots (the "Ballots," together with the Disclosure Statement and the prepackaged Plan, the "Solicitation Package") to all holders of claims required to approve the Restructuring and entitled to vote to accept or reject the prepackaged Plan, specifically, the Prepetition Lenders and Apollo.

125.     On November 10, 2009, the Debtors, through their Solicitation Agent, transmitted the Solicitation Package electronically to the agents for the Prepetition Lenders (the "Prepetition Agents").  The Prepetition Agents made the Solicitation Package available to the Prepetition Lenders through the computerized online software, IntraLinks Exchanges™.  The Solicitation Agent also electronically transmitted the Solicitation Package to Apollo.  In addition, the Solicitation Agent mailed a courtesy hardcopy of the Solicitation Package by overnight delivery to each of the Prepetition Lenders and Apollo.  The Debtors established November 25,

2009 at 12:00 p.m. as the deadline for receipt of votes to accept or reject the Restructuring and the prepackaged Plan (the "Voting Deadline").

126.    Prior to the Petition Date, the Debtors negotiated the terms of the Restructuring with their major creditor constituencies, and solicited votes on the Restructuring and prepackaged Plan through the Disclosure Statement.  Holders of claims in each of the classes entitled to vote on the prepackaged Plan voted to accept the prepackaged Plan.  Thus, there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the prepackaged Plan.

127.    Accordingly, the Debtors respectfully request that the Court schedule the Combined Hearing for January 15, 2010.  The Debtors submit that it is in the best interests of their estates, creditors, and parties in interest to hold the Combined Hearing as soon as practicable.  To avoid frustrating the purposes of the prepackaged Plan and to preserve the bargained for recoveries in these chapter 11 cases, it is imperative that the time spent by the Debtors in chapter 11 be kept to a minimum.  The proposed schedule affords all creditors, interests holders and other parties in interest ample notice of the Disclosure Statement approval and Plan confirmation proceedings.  Indeed, holders of impaired claims received a copy of the Disclosure Statement over three and one-half weeks before the Petition Date.  All other parities in interest, which are not entitled to vote, will receive notice of their treatment under the prepackaged Plan and will be provided an opportunity to obtain a copy of the prepackaged Plan and Disclosure Statement with adequate time to evaluate such documents prior to the date of the Combined Hearing.

## CONCLUSION

The Debtors hope to confirm a plan of reorganization and emerge from chapter 11 in as short a time as is necessary. The Debtors believe that the protections afforded by chapter 11 will enable them to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests, and preserve the value of their assets for the benefit of creditors and equity security holders alike.

QHB HOLDINGS LLC,
(for itself and on behalf of each of its affiliated debtors as debtors and debtors in possession)

By:_____

Daniel S. Macsherry
Executive Vice President and Chief Financial Officer

Sworn to before me on this
4th day of December, 2009

Notary Public